[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAY 22, 2006
THOMAS K. KAHN
CLERK

_____

No. 04-12034

_____

D. C. Docket No. 03-10016-CR-JLK

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ALVENIS ARIAS-IZQUIERDO,
EDUARDO JAVIER MEJIA MORALES,
NEUDIS INFANTES HERNANDEZ,
YAINER OLIVARES-SAMON,
ALEXIS NORNEILLA MORALES,
MIAKEL GUERRA-MORALES,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

(May 22, 2006)

Before BLACK, BARKETT and COX, Circuit Judges.

BARKETT, Circuit Judge:

This cases arises from the hijacking of an aircraft bound for Havana from Nueva Gerona, Cuba that was diverted to Key West, Florida. Appellants Alvenis Arias-Izquierdo, Eduardo Javier Mejia Morales, Neudis Infantes Hernandez, Yainer Olivares-Samon, Alexis Norneilla Morales, and Miakel Guerra Morales were tried on four counts pertaining to the hijacking of the plane: (1) conspiracy to commit aircraft piracy, in violation of 49 U.S.C. §§ 46502(a)(1)(A), (a)(2)(A), and 18 U.S.C. § 2 ("Count 1"); (2) aircraft piracy, in violation of 49 U.S.C. § 46502(a)(1)(A) ("Count 2"); (3) conspiracy to interfere with a flight crew, in violation of 49 U.S.C. § 46504 and 18 U.S.C. § 2 ("Count 3"); and (4) interference with a flight crew, in violation of 49 U.S.C. § 46504 ("Count 4"). Each appellant now appeals his conviction, and Hernandez, Norneilla-Morales, and Guerra Morales also appeal the sentence imposed by the district court.

## I. BACKGROUND

The government presented evidence at trial demonstrating that on March 19, 2003, the six appellants boarded an Aerotaxi DC-3 aircraft[1] scheduled to fly to Havana, Cuba from Nueva Gerona, a town located on a Cuban island known as the Isle of Youth. Alexis Norneilla-Morales boarded the flight along with his wife and young child. Norneilla-Morales's cousin, Mejia Morales, boarded the plane

---

[1] Aerotaxi is an airline owned and operated by the Cuban Civil Aviation System.

with his wife and daughter. Norneilla-Morales's brother Guerra-Morales and cousin Olivares-Samon both boarded with their wives. Hernandez and Arias-Izquierdo, neither of whom is related to Norneilla-Morales, boarded alone.

The government presented evidence that several of the appellants entered the cockpit by knocking down the door, and that Norneilla-Morales held a knife to the pilot's throat and told him to head north to Miami. The government presented evidence that several of the appellants tied up the remaining crew members and held knives and an emergency axe throughout the flight.

The Florida Air National Guard was monitoring the radar screen at Tindel Air Force Base in Panama City, Florida on the evening in question, and after observing the aircraft make a 90 degree turn north, approximately 12 seconds after its transponder started to emit the 7500 hijack signal, "scrambled" fighter jets to intercept the aircraft. Captain Adam Langston responded from Homestead Air Force Base, picked up the DC-3 emitting the 7500 signal, intercepted the aircraft, and escorted it to the Key West airport.

After the airplane landed in Key West, the airplane was met by law enforcement officers, who interrogated the appellants. U.S. Border Patrol Agent Kerry Heck testified that Norneilla-Morales told him he had planned for over a year to overtake an aircraft by force in order to go to the United States and had

3

recruited "the other five." He stated that a week before the March 19 flight, he had placed knives in a duffel bag, which he passed through the window of the airport bathroom to someone inside who hid the bag in the bathroom ceiling. Norneilla-Morales retrieved the duffel bag directly before the flight and passed the knives to others just prior to boarding. Norneilla-Morales signaled the takeover when he saw the lights of Havana and broke down the door to the cockpit.

Agent Heck testified that Guerra-Morales told him he had been involved in the takeover plan for six months, that others were involved, and that pursuant to a prearranged signal, he had stood up and pulled out his knife. His role was to guard the crew. Guerra-Morales explained that the knives had been placed in a duffel bag and hidden in the airport bathroom, that two persons had brought the knives past security, and that he had been given a knife prior to boarding.

U.S. Border Patrol Agent Gordon Solis testified that Mejia Morales told him that planning for the event had started four or five months ago, but he was not in charge. He had been given a knife, which he hid in the back of his pants, and the others also had knives. His role was to stay near the cockpit.

FBI Special Agent Anthony Russo testified at trial that the Key West police had recovered five knives and several sheaths that had been thrown on the tarmac. Two more sheaths were found on the aircraft during the search, along with a

4

hatchet, cord and tape that had been used to bind the crew, a role of tape, and the battered-in cockpit door.

The appellants' defense at trial centered on the theory that the entire crew was "in" on the plan to divert the aircraft to Miami. Norneilla-Morales testified that he had been approached by a Michael De la Nuez and by the co-pilot of the flight, Gustavo Salas Cleger, to plan a staged hijacking as a means of reaching the United States and obtaining political asylum. Norneilla-Morales testified that co-pilot Cleger designed the takeover plan, and that Cleger ensured that the airplane would have enough fuel to reach Miami, procured the appellants' tickets, and enabled them to board with knives. Norneilla-Morales claimed that he never held a knife to the Captain's throat because it was unnecessary, as the Captain was in on the plan. He explained the testimony of the crew members who testified against the appellants as arising from the crew's concerns about repercussions back in Cuba if they were to be implicated in the staging of a hijacking.

Guerra-Morales testified at trial as well. He stated that his brother, Norneilla-Morales, told him about the plan to take over an Aerotaxi flight to get to the United States. Guerra-Morales never met De La Nuez or Cleger. Guerra-Morales testified that after they boarded the plane, he gave two knives to Norneilla-Morales, who took them up to the cockpit, and three knives to

5

Hernandez and Arias-Izquierdo, but at no point did he see anyone holding a knife to the crew, and his own knife remained sheathed throughout the flight. Guerra-Morales explained that he and Norneilla-Morales had planned to tie up the crew as part of the "show," with shoe laces or draw strings on their underwear or bathing suits.

On rebuttal, co-pilot Cleger testified that he had never seen the appellants before the date of the flight. He denied knowing Norneilla-Morales or De La Nuez, denied that he had instructed appellants in any way, and denied that he gave Norneilla-Morales a compass.

At the conclusion of the trial, the jury convicted Arias-Izquierdo of Count II, Olivares-Samon and Mejia Morales of Counts I, II, and III, and Norneilla-Morales, Hernandez, and Guerra-Morales of all four counts of the superceding indictment. The district court imposed the following sentences: Arias-Izquierdo to 250 months' incarceration, three years' supervised release, and a $100 special assessment; Olivares-Samon and Mejia Morales to 240 months' incarceration and three years' supervised release as to each of Counts I, II, and III, all to run concurrently, in addition to a $300 special assessment; Hernandez to 240 months' incarceration and three years' supervised release as to each of the four Counts, all to run concurrently, and a $400 special assessment; and Norneilla-Morales and

6

Guerra-Morales to 292 months' incarceration and three years' supervised release as to each of the four Counts, to run concurrently, and a $400 special assessment. All six appellants now raise timely appeals challenging their convictions and sentences on a variety of grounds, with each appellant adopting the arguments of his co-appellants pursuant to Federal Rule of Appellate Procedure 28(i).

## II. DISCUSSION

### A. Arias-Izquierdo

Arias-Izquierdo was convicted of Count II, aircraft piracy, and acquitted of Counts I, III, and IV. He challenges his conviction for aircraft piracy on two grounds. First, he argues that the government failed to present sufficient evidence to convict him of aircraft piracy or as an aider and abettor of aircraft piracy. Second, he argues that the district court erred when it denied his motion for mistrial relating to a false statement by the prosecutor during closing arguments.

1. Sufficiency of the Evidence[2]

In order to convict Arias-Izquierdo of aircraft piracy, the government was

---

[2]Whether the record contains sufficient evidence to support a guilty verdict is reviewed de novo. United States v. Calderon, 127 F.3d 1314, 1324 (11th Cir. 1997). We view the evidence in a light most favorable to the government and the jury's verdict, with all reasonable inferences and credibility choices made in the government's favor. Id. Because Arias-Izquierdo did not introduce any evidence following his Rule 29 motion, the sufficiency of the evidence against him must be evaluated solely in terms of the proof presented in the government's case-in-chief. United States v. Thomas, 987 F.2d 697, 702-03 (11th Cir. 1993).

required to prove: (1) a seizure of, or exercise of control over, an aircraft, (2) by means of force, violence, threat of force or violence, or any form of intimidation, (3) with wrongful intent, (4) when that the aircraft was within the special jurisdiction of the United States. See 49 U.S.C. § 46502.

We have our doubts as to whether the government proved that Arias-Izquierdo himself seized or exercised control over the aircraft. However, the government did not need to prove Arias-Izquierdo's guilt as a principal because it successfully demonstrated Arias-Izquierdo's guilt as an aider and abettor, which is sufficient to support the conviction. See 18 U.S.C. § 2(a) ("Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.").

In order to prove aircraft piracy under a theory of aiding and abetting, the government was required to prove that (1) the aircraft piracy offense was committed by someone, (2) Arias-Izquierdo committed an act which contributed to and furthered the offense of aircraft piracy, and (3) Arias-Izquierdo intended to aid its commission. See 18 U.S.C. § 2; see also United States. v. Walser, 3 F.3d 380, 387 (11th Cir. 1993). The government was not required to prove that Arias-Izquierdo participated in each element of the substantive offense in order to hold him liable as an aider and abettor. United States v. Sellers, 871 F.2d 1019, 1022

8

(11th Cir. 1989).  Arias-Izquierdo admits that the government presented sufficient evidence to establish that the crime of air piracy was committed by *someone*. Instead, he argues that the government failed to prove that he associated himself with the criminal venture and committed an act in furtherance thereof.  Based on the record, we reject this contention.

The aircraft steward, Abilio Hernandez-Garcia, testified that Arias-Izquierdo stood on the first seat of the aircraft, walked through the aircraft holding a knife or an axe[3], and occasionally walked to the rear of the aircraft to speak with Hernandez and Guerra-Morales, who were guarding the crew.  According to Garcia, Arias-Izquierdo announced to the passengers that they should remain seated and that nothing was going to happen to anyone.  This testimony was corroborated by passengers Amauri Silva Bareda and Tania Dieguez Santana, both of whom identified Arias-Izquierdo in court and testified that Arias-Izquierdo announced to the passengers that they did not want any problems, and that they

---

[3]Both Arias-Izquierdo and the government explain in their briefs that there were problems at trial with the translators and the court reporter.  Garcia testified that Arias-Izquierdo carried a knife, but Garcia also appears, from the transcripts, to have testified at one point that Arias-Izquierdo and Guerra-Morales carried axes rather than knives.  Arias-Izquierdo argues that because the only weapons on the aircraft were five knives and one aircraft emergency axe that the jury could not reasonably have concluded that he was armed at all.  However, the jury could have reasonably concluded from Garcia's testimony, taken as a whole, that Arias-Izquierdo was armed with a dangerous, sharp-edged weapon during the course of the hijacking, regardless whether that weapon was a knife or axe.

9

just wanted to reach the United States.

Furthermore, Officer Madiedo testified that after the aircraft landed, he spoke with a man in a green shirt at the door of the aircraft, who was among the defendants in the courtroom. The man in the green shirt told Officer Madiedo that they were armed with knives and then helped the man dressed in all white to throw the knives on the tarmac. Although Officer Madiedo did not identify Arias-Izquierdo at trial as the man in the green shirt, he did state that the man in the green shirt was one of the defendants present in court, and photographic evidence admitted at trial confirmed that Arias-Izquierdo was the only defendant wearing a green shirt.

We conclude that the jury could have reasonably inferred that Arias-Izquierdo committed an act which contributed to and furthered the offense of aircraft piracy, and intended to aid its commission, by wielding a sharp weapon on the flight, by exclaiming to the passengers that they should remain seated and quiet, and by his admission to Officer Madiedo that he and the other hijackers were armed with knives. See United States v. Pablo-Lugones, 725 F.2d 624, 626 (11th Cir. 1984) (holding that "a display of a dangerous weapon is a sufficient use of force and violence for the purpose of hijacking," even when a defendant does not intend to use the weapon). Accordingly, the district court did not err in

10

denying Arias-Izquierdo's Rule 29 motion.

    2.  Motion for Mistrial

    Arias-Izquierdo also argues that his conviction should be reversed because the district court erred in denying his motion for mistrial, which was based on alleged prosecutorial misconduct during closing arguments. Arias-Izquierdo alleges two instances of prosecutorial misconduct during closing arguments: first, he challenges the prosecutor's statement that the evidence showed that Arias-Izquierdo was "the person who made all the announcements, and this is the person in the green shirt that also talked to Officer Madiedo," and second, he challenges the prosecutor's statement that "there is no evidence of anyone else with a green shirt in this case." Arias-Izquierdo bases his claim of error on the facts that Officer Madiedo never formally identified Arias-Izquierdo as the man in the green shirt, and that there existed several photographs depicting the more than thirty passengers on the aircraft, several of whom were wearing shirts with some green in them.[4] Arias-Izquierdo argues that the prosecutor misstated the evidence and

---

[4]Arias-Izquierdo's counsel stated during his closing argument that Officer Madiedo never identified Arias-Izquierdo as the man in the green shirt and that several of the individuals photographed as passengers on the airplane "seem to have some green in their shirts." The government objected, stating that "[t]here is no evidence of anyone else with a green shirt in this case." The district court stated to the jury, "Well, ladies and gentlemen, you can look at the pictures. If it is otherwise important, decide who has the green shirt on." Arias-Izquierdo's counsel went on to admit that Arias-Izquierdo was wearing a green shirt.

11

vouched for witnesses, so his conviction must be reversed.

In reviewing a claim of prosecutorial misconduct, we must assess (1) whether the challenged comments were improper, and (2) if so, whether they prejudicially affected the substantial rights of the defendant. See United States v. Castro, 89 F.3d 1443, 1450 (11th Cir. 1996). When reviewing a defendant's "vouching" claim, we examine whether (1) the prosecutor placed the prestige of the government behind the witness by making explicit personal assurances of the witness's credibility, or (2) the prosecutor implicitly vouched for the witness's credibility by implying that evidence not formally presented to the jury supports the witness's testimony. United States v. Cano, 289 F.3d 1354, 1365 (11th Cir. 2002); Castro, 89 F.3d at 1457.

We find no merit in Arias-Izquierdo's contention that the prosecutor's statements were improper or prejudicial. The government's argument that Arias-Izquierdo was the man in the green shirt who talked to Officer Madiedo was based upon photographic evidence depicting Arias-Izquierdo in a green shirt. The jury was free to determine whether the exhibits showed any other men wearing green shirts, whether Arias-Izquierdo was one of them or was the only one, and whether Officer Madiedo's reference to the hijacker in the green shirt, who, he testified, was one of the defendants in the courtroom, could have been someone other than

12

Arias-Izquierdo, in light of all the evidence introduced at trial. See United States v. Young, 470 U.S. 1, 16 (1985) (reviewing assertion of prosecutorial misconduct against the entire record). Accordingly, we conclude that the district court did not err in denying Arias-Izquierdo's motion for mistrial based upon prosecutorial misconduct.

## B. Eduardo Javier Mejia Morales

Eduardo Javier Mejia Morales argues that the district court abused its discretion when it refused to allow the defense to cross-examine government witnesses about their membership in the Cuban government's Communist party as a means of showing the witnesses' motives and bias in testifying against the defendants.[5] He argues that the court violated his Sixth Amendment right to confront adverse witnesses by restricting the scope of cross-examination in a manner which prevented him from challenging the biases of the government's witnesses.

The Confrontation Clause of the Sixth Amendment guarantees criminal defendants an opportunity to impeach through cross-examination the testimony of adverse witnesses. United States v. Baptista-Rodriguez, 17 F.3d 1354, 1370 (11th

---

[5]Several other appellants, including Guerra-Morales, also raise this same argument. We address here all of the Appellants' claims of error with respect to their right to cross-examine the government's witnesses.

13

Cir. 1994). The right to full cross-examination increases in importance where the witness is a chief government witness. Baptista-Rodriguez, 17 F.3d at 1366. In evaluating a Confrontation Clause violation, we must keep in mind that "[c]onfrontation means more than being allowed to confront the witness physically." Davis v. Alaska, 415 U.S. 308, 315 (1974). The Court held in Davis that the Confrontation Clause requires a defendant to have some opportunity to show bias on the part of a prosecution witness. Id.

Nevertheless, the right to cross-examination is limited, as "[t]rial judges retain wide latitude to impose reasonable limits on cross-examination based on concerns about, among other things, confusion of the issues or interrogation that is repetitive or only marginally relevant," and "[s]uch restrictions are reviewed solely for abuse of discretion." Baptista-Rodriguez, 17 F.3d at 1370-71; De Lisi v. Crosby, 402 F.3d 1294, 1302-03 (11th Cir. 2005). "A defendant's confrontation rights are satisfied when the cross-examination permitted exposes the jury to facts sufficient to evaluate the credibility of the witness and enables defense counsel to establish a record from which he properly can argue why the witness is less than reliable." Baptista-Rodriguez, 17 F.3d at 1371. We must therefore review whether the district court permitted the defendants to establish a record from which they could challenge the credibility of the government's witnesses.

The defendants' theory of the case centered on the contention that the hijacking was an event staged with the participation of the aircraft's crew, and thus could not have constituted aircraft piracy; part of this theory explained that the crew could not openly participate in the staged hijacking because of potential repercussions from the Cuban government. The defendants thus sought to cross-examine the crew members who testified for the government in order to show that their testimony was biased and dictated by the Cuban government, including by Fidel Castro himself.

The district court summarized the defendants' theory of the case as follows: "What you wish to inject, as I understand it through this series of questions, that they are coming here and not telling the truth. They are perjuring themselves because they want to curry favor with a Communist dictatorship and/or because a Communist dictatorship has told them to come here and perjure themselves." The district court on several occasions denied the defense the right to cross-examine witnesses on their allegiance to the Cuban government's Communist party as foundation to show a motive or bias to lie on the stand. The court explained that it was sustaining objections to the defendants' questions about witnesses' membership in the Communist party because he concluded that line of questioning was only for the purpose of prejudicing anti-Communist jury members against a

15

Communist witness.

Nevertheless, the court permitted questions concerning: (1) whether Captain Sanchez received any benefit from the Cuban government or his employer as a result of the incident, (2) whether Captain Sanchez received any pictures with Fidel Castro, (3) whether Captain Sanchez was interviewed by Cuban security officers, (4) whether Captain Sanchez ever served in the Cuban military, (5) whether Captain Sanchez was threatened by anyone in Cuba into testifying against the Defendants, (6) whether Fidel Castro was present when Cuban security interviewed Captain Sanchez regarding the hijacking, (7) whether Hernandez-Garcia received any promotions as a result of his participation in the trial, (8) whether co-pilot Gustavo Adolfo Salas Cleger met with representatives of the Cuban government before testifying at trial, (9) whether Salas Cleger gave television interviews to high ranking officials of the Cuban government, including Fidel Castro, and (10) whether Salas Cleger was accompanied at trial by a representative of the Cuban government.

The question presented is thus whether the district court abused its discretion in prohibiting the defendants to question the government's witnesses about their membership in the Communist party, notwithstanding the other questions concerning bias that the court permitted the defense to ask. The

16

defendants argue that the question is controlled by the Supreme Court's decision in United States v. Abel, 469 U.S. 45 (1984), in which the Court held that a trial court properly admitted evidence pertaining to a defense witness's membership in the Aryan Brotherhood because "[a] witness' and a party's common membership in an organization, even without proof that the witness or party has personally adopted its tenets, is certainly probative of bias." Id. at 52. The defendants argue that if membership in an organization may be relevant as evidence of the bias of a defense witness, it must also be relevant as evidence of the bias of a government witness, particularly because of the Sixth Amendment Confrontation Clause concerns at stake.

We conclude, however, that Abel is distinguishable from the case at bar because the mere fact of membership in the Aryan Brotherhood necessarily implied a willingness to commit perjury on behalf of one of a witness's "brothers"; in other words, lying on behalf of a fellow member was one of the defining tenets of one's membership in the Brotherhood. See id. at 54 ("The attributes of the Aryan Brotherhood – a secret prison sect sworn to perjury and self-protection – bore directly not only on the fact of bias but also on the source and strength of Mills' bias. The tenets of this group showed that Mills had a powerful motive to slant his testimony towards respondent, or even commit perjury outright."). The

Court held that the nature of the Aryan Brotherhood organization made testimony regarding the witness's membership particularly probative; thus, the lower court in Abel did not abuse its discretion when it conducted the balancing inquiry, under Federal Rule of Evidence 403, between the probative and prejudicial qualities of the evidence at issue.

In this case, the witnesses' membership in the Communist party did not, by definition, impugn their credibility. Membership in a political party, by itself, does not necessarily signify anything about a person's truthfulness and is thus distinguishable from "a secret prison sect sworn to perjury and self-protection." Id. at 54. Furthermore, the district court permitted the defendants to question the government's witnesses concerning their potential biases in terms of, inter alia, their meetings with Communist officials in Cuba, whether they felt pressured by the Cuban government to testify in a certain manner, and whether they received any benefits or promotions from the government in exchange for their testimony. In addition, the defendants cross-examined the government witnesses on the reason for there being sufficient fuel in the aircraft to reach Florida, the presence of nautical charts for South Florida on the aircraft, and alleged discrepancies between their testimony at trial and their statements as described in an FBI report. The defendants were not permitted to present a justification defense (i.e., that they

were justified in hijacking the aircraft in order to come to the United States to escape a repressive regime),[6] but were permitted to "expose[] the jury to facts sufficient to evaluate the credibility of the witness" or to "establish a record from which [they] properly [could] argue why the witness is less than reliable." Baptista-Rodriguez, 17 F.3d at 1370-71. Accordingly, having reviewed the record as a whole, we hold that the district court did not abuse its discretion in disallowing the questions directly inquiring into Communist party membership.

## C. **Neudis Infantes Hernandez**

Neudis Infantes Hernandez argues that: (1) the government failed to present sufficient evidence to support his convictions; (2) the district court erred in denying his motion to exclude a Cuban government document which was a summary prepared for the trial rather than an official record; (3) the district court erred in refusing to grant Hernandez a mistrial and severance after a Bruton violation by the government; (4) the district court erred in denying Hernandez's requested jury instructions and verdict form; (5) he was denied a fair trial because of the cumulative effect of erroneous rulings by the district court; and (6) the

---

[6]The district court granted the government's unopposed renewed motion in limine to preclude the defendants from raising the affirmative defenses of duress, necessity or justification, and prevented the defendants from introducing evidence regarding the difficult economic and political living conditions in Cuba. The grant of this motion in limine is not being challenged on appeal.

19

district court erred in sentencing Hernandez in violation of the Eighth Amendment prohibition against cruel punishment.

### 1. Sufficiency of the Evidence

Hernandez was convicted by the jury of all four counts – aircraft piracy, conspiracy to commit aircraft piracy, interference with a flight crew, and conspiracy to interfere with a flight crew. The evidence at trial demonstrated that Hernandez, like Arias-Izquierdo, wielded a knife in order to maintain security on the flight. Garcia testified that as he approached Olivares-Samon, Hernandez and Guerra-Morales grabbed him from behind, pressed a knife to him, pushed him face down on the floor of the cabin, warned him that he would be killed if he resisted, bound his hands behind him, and left him on the floor. Garcia stated that Hernandez remained at the rear of the cabin, guarding the crew, for most of the flight. Passenger Barreda testified that Hernandez distributed snacks to the passengers while holding a long knife.[7]

---

[7]Unlike Arias-Izquierdo, Hernandez does not argue that he did not have a weapon, but seems to be arguing that he did not actually use it. He cites in support Barreda's testimony that Hernandez did not hold the knife "in a threatening manner" while he distributed snacks, but rather held it in a "protective" manner. However, the flight steward, Garcia, testified that earlier in the flight, Hernandez indeed used his knife to threaten Garcia as he was being tied up. Even if Hernandez did not wield the weapon in a threatening way towards the passengers, he did so towards the crew. Furthermore, even if he did not actually use the knife, the fact that he threatened to kill Garcia if he resisted is sufficient under 49 U.S.C. § 46502. See Pablo-Lugones, 725 F.2d 624 (holding that threatening to use a dangerous weapon, even if it is never actually used, is a sufficient use of force and violence to convict for aircraft piracy).

20

With respect to aircraft piracy, Hernandez argues that he did not seize or exercise control of an aircraft, as required by 49 U.S.C. § 46502, because he only acted to secure the aircraft steward, Garcia, did not have a role in the security or control of the aircraft, and never entered the cockpit.  Hernandez argues that because Congress passed two separate provisions – one for aircraft piracy  and one for interference with the performance of a flight crew member, see 49 U.S.C. § 46504   – Congress did not intend for the aircraft piracy statute to be used against persons who interact only with the flight crew during a flight and never enter the cockpit.

We find the relevant distinction between aircraft piracy and interference with a flight crew member to be the act of the defendant rather than the identity of the victim – § 46502 prohibits the "seizing or exercising control of an aircraft . . . by force, violence, threat of force or violence, or any form of intimidation," while § 46504 criminalizes  "assaulting or intimidating a flight crew member or flight attendant of the aircraft" in a manner that "interferes with the performance of the duties of the member or attendant or lessens the ability of the member or attendant to perform those duties . . . ."  There is no support for Hernandez's assertion that the object of a defendant's force, violence, or intimidation must be directly and exclusively the pilot of an aircraft.  See, e.g., United States v. Compton, 5 F.3d

21

358 (9th Cir. 1993) (holding that defendant's delivery of a threatening note to flight attendant was sufficient to attempt air piracy because he "set in motion a chain of events that he must have intended to affect the captain of the plane" and because "the statute does not require a specific intent"). The government proved that Hernandez used intimidation and threats of violence to maintain control over the passenger cabin of the aircraft, in a manner meant to influence the flight plan and the pilot, thus the government proved sufficient evidence of Hernandez's guilt under the plain language of § 46502.

Hernandez next argues that the government did not prove sufficient evidence to convict him of conspiracy to commit aircraft piracy. The elements of the offense of conspiracy are: (1) an agreement between the defendant and one or more persons, (2) the object of which is to do either an unlawful act or a lawful act by unlawful means. United States v. Toler, 144 F.3d 1423, 1426 (11th Cir. 1998). "Because the crime of conspiracy is 'predominantly mental in composition,' it is frequently necessary to resort to circumstantial evidence to prove its elements." Id. (quoting United States v. Shabani, 513 U.S. 10, 16 (1994)). The government is therefore not required to demonstrate the existence of a "formal agreement," but may instead demonstrate by circumstantial evidence a meeting of the minds to commit an unlawful act. Id. Proof that the accused committed an act which

22

furthered the purpose of the conspiracy is an example of the type of circumstantial evidence the government may introduce to prove the existence of agreement. United States v. Sullivan, 763 F.2d 1215, 1218-19 (11th Cir. 1985).

Hernandez argues that the government presented no evidence that Hernandez agreed to participate in the crimes of air piracy and interference with a flight crew member because there was no evidence that the crimes were pre-planned. We conclude, however, that the jury reasonably could have inferred from the rapid execution of the hijacking, with each defendant springing into action upon a signal from Norneilla-Morales, that the crime had been pre-planned and that each defendant had agreed to participate by accepting those instructions. The government presented substantial evidence demonstrating Hernandez's role in the conspiracy as a person responsible for controlling the crew in the passenger cabin of the aircraft. The flight steward Garcia testified that Hernandez restrained him and remained at the rear of the cabin, guarding the crew.

Hernandez also argues that there was no evidence he agreed to a conspiracy to commit aircraft piracy because he restrained only a flight steward, thus his restraint did not contribute to the seizure and control of the aircraft. However, even if it were not true that Garcia was responsible, in part, for maintaining security in the passenger cabin of the aircraft, Garcia also testified that Hernandez

23

restrained and guarded the flight security guard, the flight technician, and the flight engineer. All of the gentlemen restrained by Hernandez held responsibilities pertaining to the security and physical integrity of the aircraft and were prevented from performing those duties by physical restraint, thus enabling Hernandez's co-conspirators to control the aircraft.

From Hernandez's actions, the jury reasonably could have inferred that Hernandez had agreed to participate in conspiracies to commit the crimes of aircraft piracy and interference with a flight crew member. Accordingly, the court did not err in denying Hernandez's Rule 29 motion for a judgment of acquittal.

2. <u>Admission of Cuban Government Document</u>

Hernandez argues that the court erred by admitting in evidence a foreign records certification and report from Cubana Airlines showing that five of the defendants previously had been passengers on the Nueva Gerona/Havana flight, and in particular, that Hernandez and Norneilla-Morales had traveled on the flight a month prior to the hijacking. The exhibit is a typed document in Spanish entitled "CERTIFICO." The document lists the flights the Defendants had taken on Cubana Airlines in 2002 and 2003. It was authenticated at trial by means of an accompanying document entitled "CERTIFICACION DE REGISTROS COMERCIALES EXTRANJEROS," or "CERTIFICATION OF FOREIGN

COMMERCIAL REGISTRIES." The authenticating document was also typewritten, however blanks were filled in by hand by Ana Isis Toboso Moreno, the Revenues Department Head of Cubana Airlines. Ms. Moreno's foreign records certification, pursuant to Federal Rule of Evidence 902(12), stated that the attached documents were prepared on or about the day that the event transpired, by persons with knowledge and in the ordinary course of business. Ms. Moreno, in certifying it as a business record, stated that Cubana Airlines maintained handwritten records, stored in folders, documenting the passengers on all of its flights.

Hernandez argues that the exhibit did not qualify as a summary of Cuban airlines records because the government did not produce the underlying originals or copies of the documents as demanded, and that it was inadmissible because the report had been generated at the request of the government for trial. The government argues that the district court properly admitted the document as a business record in the form of a report or data compilation by Cubana Airlines pursuant to Federal Rule of Evidence 803(6), not as a summary exhibit of other trial exhibits pursuant to Federal Rule of Evidence 1006.

The relevant rule, 803(6), provides that the following evidence is not excluded by the hearsay rule, even though the declarant is available as a witness:

25

A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation, all as shown by the testimony of the custodian or other qualified witness, or by certification that complies with Rule 902(11), Rule 902(12), or a statute permitting certification, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.

Fed. R. Evid. 803(6). We have held that "[t]he touchstone of admissibility under [Rule 803(6)] is reliability, and a trial judge has broad discretion to determine the admissibility of such evidence . . . ." United States v. Bueno-Sierra, 99 F.3d 375, 378-79 (11th Cir. 1996).

In this case, the district court found that the exhibit in question was a report or data compilation created by Cubana Airlines from the company's own records documenting its passengers, and thus was admissible as a business record. Hernandez argues that because the exhibit in question was prepared for purposes of litigation, it should have been ruled inadmissible. We agree.

Rule 803(6) requires that both the underlying records and the report summarizing those records be prepared and maintained for business purposes in the ordinary course of business and not for purposes of litigation. See United

26

States v. Kim, 595 F.2d 755, 760-64 (D.C. Cir. 1979) (holding inadmissible a summary of bank records even assuming the underlying records would be admissible). The government argues that the summary should be admissible because the records regarding the passengers were maintained in the ordinary course of business, citing United States v. Fugii, 301 F.3d 535, 539 (7th Cir. 2002) in support. In Fugii, the Seventh Circuit upheld the admission, under Rule 803(6), of Korean Airlines check-in and reservation records and flight manifests printed at the request of the government for use in an alien smuggling trial because such records were compiled in the airlines' ordinary course of business. Those records are distinguishable from the present records, however, because the records in Fugii were electronically stored information and the summary was simply a printout of that information.

Here, rather than a simple printout of regularly kept, computerized records, the Government sought to have admitted a typed summary of handwritten business records. This printed summary was prepared solely for trial. Rule 803(6) does not allow for the admission of such a summary. See Kim, 595 F.2d at 760-64. The Federal Rules do provide in Rule 1006 for the admission of a summary of voluminous business records, but only if certain requirements are met. Among these requirements is that other parties to the case must be provided the original

27

records upon which the summary is based -- or duplicates of those originals -- prior to the admission of the summary. In this case, the government did not provide the defendants with the original handwritten records of the passenger manifests, or any duplicates of those originals, before seeking admission of the summary. We therefore conclude that it was error for the district court to admit this document at trial.

Nevertheless, Hernandez has failed to show substantial prejudice because there was sufficient evidence of his guilt even absent the document in question. The conduct of the Defendants aboard the airplane, testified to by multiple witnesses at trial, was sufficient to support a conspiracy even without the erroneously admitted CERTIFICO.

3. *Bruton* Error With Respect to Severance

Hernandez argues that the district court committed Bruton error when it denied Hernandez's motions for mistrial and severance after Agent Heck testified that Norneilla-Morales had told her that he had planned to overtake an aircraft by force for over a year and that he had recruited "the other five." The district court denied Hernandez's motion for severance on the basis that because Norneilla-Morales was testifying at trial and would be subject to cross-examination, Hernandez's Sixth Amendment rights were not implicated by the admission of

28

Agent Heck's testimony.

In Bruton v. United States, 391 U.S. 123 (1968), the Supreme Court held that the admission of a "powerfully incriminating extrajudicial statement" of a co-defendant violates a defendant's Sixth Amendment right of confrontation even when the court instructs the jury to consider the confession only against the co-defendant. Id. at 135-36. A statement is powerfully incriminating if it expressly implicates the defendant. Id.

However, the Court clarified the Bruton rule in Nelson v. O'Neill, 402 U.S. 622 (1971), when it held that there is no Confrontation Clause problem when the "confessing" co-defendant is subject to cross-examination at trial. Id. at 627 ("The Constitution as construed in Bruton, in other words, is violated only where the out-of-court hearsay statement is that of a declarant who is unavailable at the trial for 'full and effective' cross-examination."); see also United States v. Clemons, 32 F.3d 1504 (11th Cir. 1994) (holding that because one defendant waived his Fifth Amendment right and testified, thus making him available for cross-examination, the court did not err in admitting his post-arrest statement implicating his co-defendant).

In this case, Norneilla-Morales testified at trial and was available for cross-examination, thus Hernandez's Sixth Amendment rights were not violated and his

motion for severance was properly denied.[8]

4. Jury Instructions

Hernandez next argues that the district court erred in denying his request for a jury instruction that interfering with a flight crew and conspiracy to interfere with a flight crew were lesser included offenses of the conspiracy and substantive aircraft piracy charges. Hernandez does not dispute that the superseding indictment charged the lesser included offenses as Counts III and IV. Instead, he argues that the court's failure to instruct specifically that Counts III and IV were lesser included offenses of Counts I and II deprived him of his right to argue his theory of the defense. He also argues that the court erred by refusing to instruct the jury that carrying a dangerous weapon on board an aircraft, in violation of 49 U.S.C. § 46505, and battery, in violation of Fla Stat. § 784.03 pursuant to 18 U.S.C. § 13, were lesser included offenses.

The district court's refusal to give a defendant's requested jury instruction is

_____

[8]Hernandez also argues that his right to confront adverse witnesses was violated by the government's remarks during closing argument regarding Norneilla-Morales's statement. Hernandez did not object to these remarks during trial, so we review them for plain error. United States v. Humphrey, 164 F.3d 585, 588 n.3 (11th Cir. 1999) (holding that we may not correct an error the defendant failed to raise in the district court unless there is (1) error, (2) that is plain, (3) that affects substantial rights, and even then, only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings). We conclude that there was no plain error because the prosecutor never suggested that the jury should ignore the court's limiting instruction that Norneilla-Morales's confession was to be considered only against himself, and because there was abundant evidence against Hernandez irrespective of the challenged remarks at closing.

reviewed for an abuse of discretion.  <u>United States v. Schlei</u>, 122 F.3d 944, 969 (11th Cir. 1997).  To prove reversible error, a defendant must show that the instruction: "(1) was a correct statement of the law; (2) was not adequately covered in the instructions given to the jury; (3) concerned an issue so substantive that its omission impaired the accused's ability to present a defense; and (4) dealt with an issue properly before the jury." <u>United States v. Lyons</u>, 53 F.3d 1198, 1200 (11th Cir. 1995).

We conclude that the district court did not abuse its discretion in declining to specifically state that the interference with a flight crew charges were lesser included offenses.  The court instructed the jury that a separate offense was charged against one or more of the defendants in each count of the indictment, that each charge and the evidence pertaining to it should be considered separately, that the case of each defendant should be considered separately and individually, and that they had to determine from the evidence in the case whether each individual defendant was guilty or not guilty of each of the individual charges set forth in the indictment.  The jury clearly understood this instruction, as several of the defendants were found guilty of some but not all of the four charges, while others were found guilty of all four charges.  We conclude that the jury did not need a redundant instruction that there were offenses other than aircraft piracy that they

31

could consider in evaluating Hernandez's guilt. Hernandez's requested instruction was covered by the court's instruction that Hernandez could be found guilty of some charges in the indictment and not others. Accordingly, his request was properly denied.

Hernandez next argues that the district court erred in refusing to instruct the jury that carrying a dangerous weapon on board an aircraft and battery were lesser included offenses. In order for an offense to be a lesser-included offense of a parent offense, its elements must be contained within the elements of the parent offense. See Schmuck v. United States, 489 U.S. 705, 716 (1989); United States v. Stone, 139 F.3d 822, 839 n.15 (11th Cir. 1998).

The elements of carrying a dangerous weapon on board an aircraft, under § 46505, are that the defendant: (1) boarded an aircraft involved in air transportation; (2) knowingly had on or about his person a concealed dangerous weapon which would be accessible to him in flight, or placed a loaded firearm on the aircraft in property not accessible during flight, or placed a bomb or incendiary device on the aircraft; and (3) acted willfully and with reckless disregard for the safety of human life. See Eleventh Circuit Pattern Jury Instruction 104, at 505 (2003). Section 46505 involves elements not included within the offenses charged in the indictment, thus it was not an abuse of discretion to decline to instruct the

32

jury as to this offense. Similarly, the elements of battery are not included within the charged offenses. Accordingly, the district court did not commit reversible error in declining to give Hernandez's desired instruction.

5. Cumulative Error

Hernandez argues that even if each of the district court's asserted errors, standing alone, are insufficient to merit reversal, we should evaluate the cumulative effect of the asserted errors to find prejudice requiring reversal. See, e.g., United States v. Preciado-Cordobas, 981 F.2d 1206, 1215 n.8 (11th Cir. 1993). Because we conclude that the district court did not commit prejudicial error, whether standing alone or taken cumulatively, we affirm Hernandez's conviction.

6. Sentencing

Hernandez received the statutory minimum sentence of 20 years, but challenges his sentence on the basis that 20 years constitutes cruel and unusual punishment in violation of the Eighth Amendment.

Because this is a non-capital case involving a statutory minimum, "the Eighth Amendment encompasses, at most, only a narrow proportionality principle." United States v. Raad, 406 F.3d 1322, 1323 (11th Cir. 2005). We must make a threshold determination that a sentence imposed is grossly

33

disproportionate to the offense committed and, if it is grossly disproportionate, we must then consider the sentences imposed on others convicted in the same jurisdiction and the sentences imposed for the commission of the same crime in other jurisdictions.  Brant, 62 F.3d at 368.  Furthermore, a sentence which is not otherwise cruel and unusual does not become so simply because it is "mandatory." Id. (citing Harmelin v. Michigan, 501 U.S. 957, 995 (1991)).

We conclude that the 240-month, or 20 year, statutory minimum sentence is not grossly disproportionate to the offense of conviction.  The hijacking of a passenger aircraft is an extraordinarily dangerous undertaking, putting at risk the lives of all passengers and, as we know too well after the events of September 11, 2001, potentially the lives of many others as well.  Congress assigned a mandatory minimum sentence of twenty years for air piracy cases when it enacted 49 U.S.C. § 46502(a)(2)(A) and (B), except in those instances in which death of another individual results, in which case the defendant shall either receive a sentence of life imprisonment or death.  We are required to "grant substantial deference to the broad authority that legislatures necessarily possess in determining the types and limits of punishments for crimes, as well as to the discretion that trial courts possess in sentencing convicted criminals."  Solem v. Helm, 463 U.S. 277, 290 (1983); see also Raad, 406 F.3d at 1323.  Furthermore, the fact that Hernandez

34

claims, in his defense, that he was fleeing a repressive Cuban government is not a consideration in the proportionality inquiry. Cf. United States v. Rojas, 47 F.3d 1078, 1082 (11th Cir. 1995) (holding that downward departure was not warranted under guidelines applicable when defendant commits a crime in order to avoid perceived greater harm where defendant professed the belief that his criminal action is furthering a greater political good in Cuba). Accordingly, we find that the statutory minimum sentence of 20 years imprisonment was not cruel or unusual in violation of the Eighth Amendment.[9]

### D. Yainer Olivares Samon

Yainer Olivares Samon argues that the district court erred in denying the defense the opportunity to cross-examine government witnesses as to their motives and bias in testifying against the defendants. We have already rejected this argument, which is the only one raised by Olivares Samon in his brief.

### E. Alexis Norneilla-Morales and Miakel Guerra Morales

Alexis Norneilla-Morales argues that: (1) the district court erred in denying his theory of defense instruction; (2) the district court erred in denying post-trial

---

[9]We also conclude that the district court did not commit reversible Booker error with respect to Hernandez's sentence. Hernandez's substantial rights were not affected even though he was sentenced under a mandatory guidelines system because the district court sentenced Hernandez to the statutory minimum, without resort to any guideline enhancements.

discovery regarding the flight attendant's defection to the United States; (3) he was denied a fair trial because of the cumulative effect of erroneous rulings by the district court; and (4) the district court committed <u>Booker</u> error in applying the guidelines. Guerra-Morales raises arguments with respect to his conviction that we have already rejected,[10] and also raises the same sentencing objection as Norneilla-Morales.

    1. <u>Jury Instructions</u>

Norneilla-Morales argues that the court erred by denying his "wrongful intent" instruction, which defined "knowingly" as acting "voluntarily and intentionally and not because of mistake or accident <u>or other innocent reason</u>." (emphasis added). He contends that this language would have enabled him to argue his defense to the jury that the crew was complicit in the hijacking.

The government objected to the proposed instruction on the grounds that the term "knowingly" was correctly defined in the Eleventh Circuit Pattern Instruction and that the same definition for "knowingly" should be used throughout the

---

[10] Miakel Guerra Morales argues that: (1) the district court abused its discretion when it refused to allow the defense to cross-examine government witnesses as to their motives and bias in testifying against the defendants; (2) the district court abused its discretion in limiting the scope of the lead defense witness as to the defendants' plan to come to the United States; (3) the district court abused its discretion by denying Morales's request for disclosure of information pertaining to government witness Abilio Hernandez-Garcia; and (4) the district court erred in enhancing his base offense level by two points for obstruction of justice based upon trial testimony.

36

instructions. The court denied Norneilla-Morales's request because it found that his desired "wrongful intent" instruction was "not really applicable to the case in the sense that there is no question of mistake or accident, and the innocent reason is the violent strong feeling against the regime in Cuba."

We conclude that the district court did not commit reversible error in denying Norneilla-Morales's requested instruction because the requested "or other innocent reason" language would have misled the jury into thinking that Norneilla-Morales's conduct could be excused because their desire to leave Cuba and come to the United States was an "innocent reason" for hijacking the aircraft. The district court held that the defendants could not raise a justification defense, and that ruling is not being challenged on appeal. Norneilla-Morales's proposed jury instructions were merely a backdoor means of making the justification defense. The district court's instruction regarding intent – that "knowingly" means "the act was done voluntarily and intentionally and not because of mistake or accident" was a correct statement of the law and adequate to cover the charged crimes.

Furthermore, the instruction was not necessary for Norneilla-Morales to argue his theory of defense – that the hijacking had been staged and the crew was "in on it." Norneilla-Morales, Arias-Izquierdo, and Guerra-Morales argued that

37

the hijacking had been staged. Olivares-Samon characterized the hijacking as a "freedom flight," arguing that there was no credible evidence that he had committed acts of violence or intimidation. So too did Hernandez. Mejia Morales compared the flight to the Jews who tried to flee Nazi Germany and the Germans who died attempting to cross the Berlin Wall. Defense counsel suggested in closing argument that the conduct of the defendants was justified.

2. Post-Trial Discovery

Norneilla-Morales argues that the district court abused its discretion when it denied the appellants' motion for post-trial discovery involving the flight steward Garcia's decision to remain in the United States after the government learned of Garcia's defection. He claims that the fruits of such an inquiry might have supported a motion for a new trial based upon either perjured information or the government's failure to disclose exculpatory evidence as required by Brady v. Maryland, 373 U.S. 83 (1963). He maintains that at the very least, the court was required to hold an evidentiary hearing, order the release of Garcia's asylum application or to conduct an in camera review of such materials.

The record demonstrates the following. The trial ended on December 11, 2003. On December 19, 2003, the government informed the defendants that the prosecutors had just learned of Garcia's decision not to return to Cuba. The

defendants filed motions to require the government to provide them with Garcia's contact information or to produce him for interview. On March 4, 2004, the court denied the defendants' motions, finding that they had not contended that the government had obtained exculpatory information from Garcia, but ordered the government to inquire whether Garcia wished to change his testimony or be interviewed by the defendants.

On March 11, 2004, the government responded that Garcia has stated he did not wish to change his testimony nor be interviewed by the defendants. The following week, Guerra-Morales filed a motion demanding interview reports pertaining to Garcia, or at a minimum, for an in camera review of asylum application documents, asserting that they constituted exculpatory evidence under Brady. The court denied the motion for production, holding that the defendants' vigorous cross-examination of Garcia at trial meant that any information surrounding Garcia's defection would not make his testimony any less believable and would not constitute grounds for changing the verdict or ordering a new trial.

The rule regarding exculpatory evidence announced in Brady applies after trial when it is discovered that the prosecution had material information of which the defense was unaware. Untied States v. Agurs, 427 U.S. 97, 103 (1976). In Untied States v. Quinn, 123 F.3d 1415 (11th Cir. 1997), we held that the

39

government was not required to disclose the contents of personnel files or submit them for in camera review simply based on the defendant's unsupported contention that they might contain information of significance to his case. Id. at 1421-22. We declined to order discovery based upon mere speculation as to whether the material would contain exculpatory evidence because to do so would "convert Brady into a discovery device and impose an undue burden upon the district court." Id. at 1422 (quotation marks and citation omitted).

This case is unlike those cited by the defendants in which a witness perjures himself at trial and the defense discovers exculpatory evidence to that effect after trial. See, e.g., United States v. Espinosa-Hernandez, 918 F.2d 911 (11th Cir. 1990). The defendants here made no showing that Garcia perjured himself at trial, during his pre-trial deposition, or at any other point. Instead, they merely speculate that his asylum application might show that he lied at trial, not because he was trying to curry favor with the Cuban government, as they alleged at trial, but under their new theory that he was trying to curry favor with the United States government. However, Garcia's testimony at trial – that he was tied up at knife-point by the defendants – was corroborated by multiple witnesses at trial. Accordingly, we conclude that the district court did not commit reversible error in denying defendants' request for post-trial discovery as to Garcia's immigration

40

status.

3. <u>Cumulative Error</u>

Like Hernandez, Norneilla-Morales argues that even if each of the district court's asserted errors, standing alone, are insufficient to merit reversal, we should evaluate the cumulative effect of the asserted errors to find prejudice requiring reversal. Here too, because we conclude that the district court did not commit prejudicial error, whether standing alone or taken cumulatively, we affirm Norneilla-Morales's conviction.

4. <u>Sentencing Error</u>

Both Norneilla-Morales and Guerra-Morales argue that the court erred in enhancing their base offense levels by two points for obstruction of justice based upon trial testimony. We agree, as we find that there is reversible <u>Booker</u> statutory error here. The first prong of the plain error test is easily satisfied because the district court considered the guidelines as mandatory during sentencing. <u>See</u> <u>Shelton</u>, 400 F.3d at 1330-31. The second prong is also satisfied because "where the law at the time of trial was settled and clearly contrary to the law at the time of appeal – it is enough that an error be 'plain' at the time of appellate consideration." <u>Johnson v. United States</u>, 520 U.S. 461, 468 (1997). Under <u>Booker</u>, viewing the guidelines as mandatory is plainly erroneous. <u>United</u>

41

States v. Dacus, 408 F.3d 686, 689 (11th Cir. 2005).

As to the third prong, Norneilla-Morales and Guerra-Morales must demonstrate that the plain error affects their substantial rights and that the error "actually did make a difference." Rodriguez, 398 F.3d at 1298. They have met this burden because they have shown a reasonable probability that the court would have imposed a lower sentence if the guidelines had been advisory. The court stated that it was "reluctant" to apply the obstruction of justice enhancement because of the "very substantial increase" in sentencing. The court also stated that it was sentencing all of the co-defendants at the low end of the guidelines range because "this is sufficient or indeed more than sufficient punishment and deterrent." The combination of these facts and statements demonstrates a reasonable probability that the court would have imposed a different sentence if the guidelines were advisory, thus the defendants have shown that plain error affected their substantial rights. For these same reasons, Norneilla-Morales and Guerra-Morales also satisfy the fourth prong of the plain error test – a reasonable probability that the court would impose a lesser sentence.

### III. CONCLUSION

Based on the foregoing, the appellants' convictions are **AFFIRMED**. The sentences of Hernandez, Olivares Samon, Mejia Morales, and Arias-Izquierdo are

**AFFIRMED**.  We **VACATE** the sentences of Norneilla-Morales and Guerra Morales and **REMAND** to the district court for resentencing as to those defendants.