[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 25, 2006
THOMAS K. KAHN
CLERK

No. 05-16704
Non-Argument Calendar

_____

D. C. Docket No. 04-00120-CR-FTM-33-DNF

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

TODD FITZGERALD FRAZIER,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

**(August 25, 2006)**

Before CARNES, PRYOR and FAY, Circuit Judges.

PER CURIAM:

Todd Fitzgerald Frazier appeals his conviction for possession with intent to distribute 50 or more grams of cocaine, a violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A)(iii), for which he received a life sentence. On appeal, he argues that the district court erred by (1) denying his motion to suppress evidence; (2) denying his motion for a judgment of acquittal based on insufficient evidence of guilt; and (3) denying his request for a jury instruction regarding possession. For the reasons set forth more fully below, we affirm.

Prior to trial, Frazier filed a motion to suppress evidence seized following a traffic stop of the vehicle he was driving. He argued that the police had gone on a "fishing expedition" and extended the duration of the stop beyond the scope of the stop's original purpose.

At the suppression hearing, the government called Corporal Edward Ahlquist of the Lee County Sheriff's Office, who testified that he was the handler of Orson, a K-9. Ahlquist testified that, on October 20, 2004, he and his K-9 partner, Orson, arrived on the scene of a vehicle stop initiated by Corporal Hedrick at approximately 2:15 (a.m.), and Hedrick indicated to Ahlquist that he wanted Orson to perform a sniff. At the time, Hedrick was talking to Frazier with a ticket book in his hand, but Ahlquist did not know when the stop had occurred. Prior to "running" his dog, Hedrick removed the lone passenger from the car, and Ahlquist

then took his dog to the driver's side door.  The dog's normal response was to turn his head toward the door seam, but Orson went into deep breathing and "bladed" his body toward the scent two separate times, although he did not scratch, which would have been an indicator of a "full alert."  Ahlquist then told Hedrick that Orson had given a lot of investigation into the door seam, but hadn't fully alerted, and he directed Hedrick to run Chance, Hedrick's K-9 partner.  Ahlquist then took Orson back to his car, and, while Hedrick retrieved Chance, Ahlquist held the ticket book and stayed with Frazier and the passenger.  Ahlquist testified that, based on Orson's response to the door, he expected Orson to scratch and believed he had probable cause for searching the vehicle.  Ahlquist did not know with 100 percent certainty whether Hedrick had finished writing the citation for Frazier.

Ahlquist then testified that Frazier was "making [him] nervous" by pacing, looking over his shoulders, clasping his hands, and appearing as though he might try to run.  Ahlquist further testified that, in his experience, Frazier's level of nervousness exceeded that of a typical stop. Ultimately, Chance gave an alert on the vehicle and Hedrick performed a search, during which Frazier went into a "praying motion."  The search revealed nine and a half ounces of crack cocaine under the steering wheel column, the same general vicinity that Orson had given his abnormal reaction.  On cross-examination, Ahlquist testified that he could not

3

remember whether he was radioed about the traffic stop or just came upon the traffic stop and he did not know how long the stop had been in progress when he arrived.

Next, Ahlquist testified in relevant part that, from his experience, writing a warning ticket with no interruptions takes one to two minutes. If the time it took to run all the computer checks was included, he testified that writing the ticket could take as much as eight minutes. Ahlquist further testified that he had been at the traffic stop about a minute and a half or two minutes when he retrieved Orson from his car. Later, Ahlquist stated that he considered Orson's abnormal response an alert and believed that narcotics were in the car based on that response. However, with a second dog on the scene it was not uncommon to have the second dog "run the car," which also served the additional purpose of protecting the interests of the stopped individual. Ahlquist further testified that approximately two to two and a half minutes elapsed between the time he arrived on the scene and Hedrick's dog, Chance, alerted to the vehicle.

Next, the government called Corporal Hedrick, who handled the K-9, Chance. On October 20, Hedrick observed a green Suburban going 84 m.p.h. in a 70 m.p.h. zone and conducted a traffic stop. During a typical stop, Hedrick remained in his car for 30 to 40 seconds to ensure it's safe to approach the stopped

4

vehicle, and once it's safe, he walks to the driver's side door and requests the driver's license, vehicle registration, and proof of insurance. The driver of the car in this case was identified as Frazier, and Hedrick testified that his hands were shaking when he turned over his license, which in Hedrick's experience was a show of nervousness in excess of what he normally expected to see in a traffic stop. Frazier did not provide the registration or the insurance, stating that car belonged to his friend, Stacy, although he provided no further information—not even a last name—which Hedrick found unusual. At that point, Hedrick, for safety reasons, asked Frazier to exit his vehicle and move toward his police cruiser. As he walked towards Hedrick's car, Hedrick observed Frazier clasping and unclasping his hands repeatedly, which in Hedrick's experience often indicated that a person was ready to fight or become violent. Hedrick further testified that Frazier did not stand still as asked, but paced in between the vehicles and later rocked back forth when he stopped pacing. Once positioned in front of Hedrick's car, Hedrick observed Frazier staring at the side of the road with darting eyes, making Hedrick fear that Frazier might run.

Hedrick then informed Frazier that he was going to check Frazier's license and the registration on the vehicle, and, if the license was fine and he had no active warrants, he would be issued a warning citation and be free to leave. Hedrick

testified that, ordinarily, motorists cease being nervous when told they will receive only a warning citation, but Frazier's nervousness actually increased, which concerned Hedrick. At that point, Hedrick returned to his vehicle and contacted dispatch, which occurred approximately four to five minutes after the stop had been initiated. After Hedrick radioed dispatch, but before he had received information back from dispatch, Ahlquist arrived on the scene, and Hedrick signaled him to use his dog to check the vehicle.

Hedrick then asked Frazier some questions, and Frazier indicated that he was coming from Ft. Lauderdale, where he had checked on a vehicle that had broken down to retrieve a title from the trunk. Frazier said that he had been in Ft. Lauderdale for 45 minutes, which Hedrick found unusual because the trip from Largo, where Frazier originally had departed, to Ft. Lauderdale was approximately 9 hours round-trip, making a 45 minute stay quite short for the length of the drive. Dispatch then reported that Frazier had a valid license and the car was not reported stolen, but it further reported that Frazier was on inmate release for trafficking in cocaine. Concerned that the car might be stolen based on Frazier's inability to produce a registration or a last name of the alleged owner, Hedrick questioned the passenger, who said that the car belonged to Frazier's friend, Stacy, but provided no additional information. The passenger also said that the trip to Ft. Lauderdale

6

was to drop off a friend and they stayed for four or five hours, inconsistent with Frazier's explanations. Hedrick then asked the passenger to step outside the vehicle and stand next to Frazier.

Hedrick then continued to fill out the citation while Ahlquist scanned the car with his dog. Ahlquist then informed Hedrick that Orson had "abnormaled" and requested that Hedrick run his dog around the car. After Ahlquist returned his dog to the car, Hedrick handed him his warning book and used his dog to perform a free air sniff around Frazier's car. The dog alerted, prompting a search that revealed narcotics. Hedrick further observed that, when Ahlquist's dog approached Frazier's car, Frazier's legs "seemed like they collapsed underneath him or gave out."

On cross-examination, Hedrick testified that he made the initial stop at approximately 2:13 a.m. Next, Hedrick testified that an average traffic stop lasts between 8 and 11 minutes, but could last longer because a stop involves more than merely writing a citation. He also stated that, by the time Frazier had exited his car and walked to the front of Hedrick's car, Hedrick had already determined, based on Frazier's behavior and statements, that he would conduct a free air sniff. However, Hedrick reiterated that Frazier was being detained for violating traffic laws by speeding, not because Hedrick wanted to conduct a free air sniff. Hedrick further

7

testified that Frazier's vehicle was determined to belong to someone named Stacy. As to the total amount of time between the traffic stop and Chance's alert on the vehicle, Hedrick testified that it was approximately seven minutes, and that during those seven minutes, he had not completed all the components of the stop and did not try to prolong Frazier's detention for any reason.

The court found that Hedrick's dog, Chance, alerted within seven minutes of the traffic stop, and, in light of precedent upholding a 14-minute traffic stop detention, found that the detention here was based on a valid traffic stop and not unreasonable. It further found that, once Frazier was stopped, the officer had reasonable suspicion to believe that something was "going on," and, as a result of the dog's alert, had probable cause to search the vehicle, where narcotics were found. Accordingly, Frazier's motion to suppress was denied.

At trial, the government presented Hedrick's testimony regarding the details of the traffic stop, which also included that, when Frazier was asked to step out of his vehicle, he was breathing very rapidly. Hedrick also testified that, during his search of Frazier's vehicle, he discovered a felt bag underneath the steering wheel, a photo of which was published to the jury. Hedrick then informed the jury that the contents of the bag turned out to be 230.7 net grams of cocaine base and 14.7 grams of cocaine, the street value of which he approximated at $20,000.

8

Following Frazier and Jones's arrests, they were placed in the back of a police car for 20 to 30 minutes with a digital recorder running. Hedrick retrieved the recording, which captured a conversation between Frazier and Jones that was later enhanced by the FBI and placed on a compact disk. On the recording, Hedrick heard a reference to "chunked up," which he testified was a term used to describe how cocaine is packaged. Hedrick also testified that, to his knowledge, no fingerprints were lifted from the bag containing the cocaine and cocaine base. As to the expression "chunked up," Hedrick testified that chunk could be used to describe "a million things," including throwing. Hedrick further admitted that the audio recording was at times inaudible and it was difficult to hear complete sentences.

Next, the government called Ahlquist, who also gave virtually the same testimony regarding his involvement in the traffic stop as he did at the suppression hearing. The government also called forensic chemist, Yanette Gattorno, to testify that her analysis of the substances seized from Frazier's vehicle revealed 230.7 grams of cocaine base and 14.7 grams of cocaine. The government's next witness was Drug Enforcement Administration (DEA) Task Force Agent Michael Masiero, who participated in the transcription of the conversation recorded between Frazier and Jones. That transcript was admitted as a demonstrative aid during the playing

9

of the tape for the jury. Among the relevant portions of that transcript, Frazier was recorded as having said, "should'a dumped that shit. . . . Shit out the window . . . had it chunked up . . . while he was looking . . . ." The government rested, and Frazier moved for a judgment of acquittal on grounds that the circumstantial evidence in the case failed to make out a prima facie case of constructive possession. The motion was denied.

As a jury instruction, Frazier requested that the court add the following: "The defendant's mere presence in the area of the thing alleged or aware[ness] of its location is not enough to establish actual constructive possession." The government objected, and the district court eventually sustained that objection, finding that the cases Frazier relied upon for the instruction were factually inapposite, and, therefore, the instruction could be misleading. The instruction actually given to the jury regarding possession was as follows:

> The law recognizes several kinds of possession. A person may have actual possession or constructive possession. A person may also have sole possession or joint possession. A person who knowingly has physical control of something is then in actual possession of it. A person who is not in actual possession but who has both the power and the intention to later take control over something, either alone or together with someone else, is in constructive possession of it.

The jury was further instructed that the term knowingly was defined as "done voluntarily and intentionally and not because of mistake or accident."

Additionally, the jury was instructed that it could find that Frazier acted "knowingly" if he actually knew that he possessed cocaine base or deliberately closed his eyes to what he had every reason to believe was cocaine base. A jury convicted Frazier of the sole count in the indictment. Frazier filed a motion for a new trial that was denied, and the district court later sentenced Frazier to a statutorily required life sentence.

## I. Motion to Suppress

On appeal, Frazier argues that the district court erred by denying his motion to suppress because the evidence at the suppression hearing did not support its findings of fact or ultimate conclusions. In particular, Frazier argues that the use of the dogs to perform a sniff made the duration of his detention unreasonable, and, therefore, the sniff was unconstitutional. He further argues that, between the testimony of Ahlquist and Hedrick, no evidence was presented concerning the length of Frazier's detention, but the district court concluded that a detention of 14 minutes was not unreasonable despite there being no testimony that the stop lasted 14 minutes.

"A district court's ruling on a motion to suppress presents a mixed question of law and fact." United States v. Zapata, 180 F.3d 1237, 1240 (11th Cir. 1999). We accept the district court's findings of fact to be true, unless shown to be clearly

11

erroneous, and reviews the district court's application of the law to those facts de novo. Id. These factual findings include the district court's credibility determinations, to which we will "accord considerable deference." United States v. Ramirez-Chilel, 289 F.3d 744, 749 (11th Cir. 2002) (citation and internal quotation marks omitted). In fact, we have stated that we "should defer to the . . . judge's [credibility] determinations unless his understanding of the facts appears to be "unbelievable." Id. (citation omitted). "[A]ll facts are construed in the light most favorable to the prevailing party below." United States v. Bervaldi, 226 F.3d 1256, 1262 (11th Cir. 2000). "The individual challenging the search has the burdens of proof and persuasion." United States v. Cooper, 133 F.3d 1394, 1398 (11th Cir. 1998).

The Fourth Amendment protects individuals from "unreasonable searches and seizures" by government officials, and its protections extend to "brief investigatory stops of persons or vehicles." United States v. Arvizu, 534 U.S. 266, 273, 122 S.Ct. 744, 750, 151 L.Ed.2d 740 (2002). For brief investigatory stops, the Fourth Amendment is satisfied if the police officer has a "reasonable suspicion" to believe that criminal activity "may be afoot." Id. (citing Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). When determining whether reasonable suspicion exists, courts must consider the totality of the

circumstances to determine whether the police officer had a "particularized and objective basis" for suspected legal wrongdoing. <u>Arvizu</u>, 534 U.S. at 273, 122 S.Ct. at 750. A decision to stop a vehicle is reasonable under the Fourth Amendment where an officer has probable cause to believe that a traffic violation occurred. <u>United States v. Simmons</u>, 172 F.3d 775, 778 (11th Cir. 1999).

Secondly, "an officer's investigation of a traffic stop must be reasonably related in scope to the circumstances which justified the interference in the first place." <u>United States v. Boyce</u>, 351 F.3d 1102, 1106 (11th Cir. 2003) (quotation and citation omitted). The stop must be of limited duration and may not last "any longer than necessary to process the traffic violation unless there is articulable suspicion of other illegal activity." <u>United States v. Purcell</u>, 236 F.3d 1274, 1277 (11th Cir. 2001). The duration of the traffic stop "must be limited to the time necessary to effectuate the purpose of the stop." <u>Id.</u> However, where the initial traffic stop is legal, the officer has "the duty to investigate suspicious circumstances that then [come] to his attention." <u>United States v. Harris</u>, 928 F.2d 1113, 1117 (11th Cir. 1991). Additionally, police are "entitled under the decisional law to conduct a variety of checks on the driver and his car, including questioning the driver about the traffic violation, requesting consent to search the car, <u>and</u> running a computer check for outstanding warrants." <u>Simmons</u>, 172 F.3d

13

at 778; see also Purcell, 236 F.3d at 1278 ("The request for criminal histories as part of a routine computer check is justified for officer safety. It is both reasonable and minimally intrusive.").

Here, there is no dispute that the police had probable cause to stop Frazier because he violated traffic laws by speeding. Moreover, the evidence, taken in a light most favorable to the government, supports the district court's denial of Frazier's motion to suppress. Officer Hedrick testified that he stopped Frazier, waited 30 to 40 seconds to ensure safety, and then walked to Frazier's driver's side door to request his driver's license, vehicle registration, and proof of insurance. Frazier was only able to provide the license, and when he did so, his hands were shaking, indicating a level of nervousness above what Hedrick ordinarily observed during a routine traffic stop. When Hedrick could not provide the registration or proof of insurance, and further could not even recall the last name of the friend who loaned him the vehicle, Hedrick requested that Frazier exit the vehicle for safety reasons and directed him toward the police cruiser. Frazier made hand movements that Hedrick previously had seen in persons who were ready to fight or become violent. At times, Frazier was observed staring at the side of the road, heightening Hedrick's concern that Frazier might run. Hedrick, as he was permitted "under decisional law," began to run a check on Frazier's license, but

14

even after Frazier was told he would be free to go if the license came back clean, Frazier became more nervous. Hedrick's call to dispatch was made within five minutes of the original stop. While talking to Frazier, Hedrick learned that Frazier had traveled to Ft. Lauderdale and stayed only 45 minutes, a short stay given Hedrick's estimation that the trip should have taken 9 hours round-trip. Jones's version of the story was different. Notably, the computer check revealed that Frazier was on inmate release for trafficking in cocaine.

Meanwhile, while Hedrick was talking to Frazier, Officer Ahlquist arrived on the scene with his K-9, Orson. Hedrick indicated to him that he wanted Orson to run a sniff, which Ahlquist completed, resulting in an abnormal response to the driver's side door. Ahlquist believed that Orson's response was sufficient to conduct a search, but because a second dog was on the scene, asked Hedrick to run his K-9, Chance. When Orson first approached Frazier's car, Hedrick observed that Frazier's legs "seemed like they collapsed underneath him or gave out." When Hedrick began searching Frazier's car based on Chance's positive alert, Ahlquist observed Frazier making a "praying motion." All told, Hedrick testified that approximately seven minutes elapsed from the initial stop to the time that Chance gave his alert to the door.

Based on the foregoing, it cannot be said that the stop was unreasonably

15

prolonged or the search unsupported by probable cause. While Hedrick was running a computer check and asking Frazier questions, Ahlquist arrived on the scene with his K-9 unit. At that point, Hedrick had already observed Frazier behaving in nervous fashion, such as his hands shaking when he turned over the license and making gestures indicative of fighting or glances indicative of fleeing the scene. Moreover, Frazier had only a license and did not even know the last name of the person who loaned him the car he was driving. When Ahlquist arrived on the scene, Hedrick was still in the process of investigating his stop, and, at that point, had Ahlquist run Orson on a sniff test. When that test resulted in an abnormal response, though one that Ahlquist believed provided probable cause for a search, Ahlquist requested an additional safeguard on Frazier's behalf—an additional sniff test by another dog, Chance, who alerted to the presence of narcotics at the driver's side door. In light of Frazier's observed responses, including nervousness, knee-buckling, praying, and the inconsistent stories of driver and passenger, combined with a positive alert by a trained K-9 unit, probable cause existed to search the vehicle. Furthermore, the uncontroverted testimony, taken in a light most favorable to the government, was that the time between the stop and Chance's alert was approximately seven minutes, and, therefore, we conclude that the stop was not unreasonably prolonged. Purcell, 236

16

F.3d at 1279 ("Fourteen minutes is not an unreasonable amount of time for a traffic stop.).

Finally, the core of Frazier's argument is that "there was a complete absence of evidence concerning the length of detention associated with the traffic stop." However, as noted above, Hedrick testified that Frazier was detained approximately seven minutes from the time of the stop to the time Chance alerted to the driver's side door, and we are required to credit that testimony on appeal. We conclude that the district court properly denied Frazier's motion to suppress.

## II. Sufficiency of the Evidence

Next, Frazier argues that the evidence presented at trial was insufficient for a reasonable jury to infer that he was aware that the cocaine was in the vehicle, and, therefore the district court erred by denying his motion for a judgment of acquittal. In particular, he argues that there was no direct evidence, such as an admission or his fingerprints on the bag containing the drugs, linking him to the cocaine in the car and the government's case rested on a statement pulled from a nearly inaudible tape referencing what possibly could have been a slang reference to the way in which cocaine is packaged. Frazier further argues that his "mere presence" in the area of the cocaine or his awareness was insufficient to prove he had possession of it and the government's evidence, at most, established that he was in the presence

17

of the cocaine.

We review a challenge to the sufficiency of evidence de novo. United States v. Silvestri, 409 F.3d 1311, 1327 (11th Cir.), cert. denied 126 S.Ct. 772 (2005). A guilty verdict will not be disturbed unless, "given the evidence in the record, no trier of fact could have found guilt beyond a reasonable doubt." Id. (quotation omitted). When evaluating the sufficiency of the evidence, we examine "the evidence in the light most favorable to the government, drawing all reasonable inferences and making all credibility choices in the government's favor." Id. "Where, as here, the Government's case is based on circumstantial evidence, 'reasonable inferences, not mere speculation, must support the jury's verdict.'" United States v. McDowell, 250 F.3d 1354, 1364 (11th Cir. 2001).

"To convict a defendant of possession with intent to distribute controlled substances, the Government must prove that he or she possessed drugs with the intent to distribute them. . . . The government may prove each of these elements with direct or circumstantial evidence." United States v. Miranda, 425 F.3d 953, 959 (11th Cir. 2005) (quotations and citation omitted). "The government may satisfy the 'possession' prong by showing either actual or constructive possession. To prove actual possession the evidence must show that the defendant either had physical possession of or personal dominion over the thing allegedly possessed."

United States v. Leonard, 138 F.3d 906, 909 (11th Cir. 1998). "Constructive possession exists when a defendant has ownership, dominion, or control over an object itself or dominion or control over the premises or the vehicle in which the object is concealed." Id.

To establish possession, we have held that the government must show that the defendant was more than merely present in the car containing contraband. Id. We require that some nexus exist between the defendant and the contraband, and a defendant must have knowledge of the substance's existence to exercise control or dominion over it. Holmes v. Kucynda, 321 F.3d 1069, 1080 (11th Cir. 2003). Evidence of a "consciousness of guilt," such as nervousness, inconsistent statements or stories, and anxiousness regarding the search, is sufficient for a jury to infer a defendant's knowledge of the controlled substances found in a car. See United States v. Stanley, 24 F.3d 1314, 1320, n.50 (11th Cir. 1994) (citations omitted).

In the instant case, the jury reasonably could have inferred Frazier's knowledge and possession of the cocaine in the car because there was adequate circumstantial evidence showing a consciousness of guilt. Hedrick testified that Frazier was excessively nervous to the point his hand was shaking when he handed over his license during the traffic stop. He further testified that Frazier's

19

movements were indicative of someone who was ready to fight or flee. Hedrick also observed Frazier's knees buckle when Ahlquist ran his dog, Orson, around the vehicle, and Ahlquist observed Frazier in a praying motion when the car was actually searched. Moreover, Frazier and his passenger gave inconsistent stories. Finally, the government presented evidence of a conversation between Frazier and Jones in which references were made to throwing things out the window and the term "chunked up" was used—a term that Hedrick testified was slang for the way cocaine is packaged. In light of the foregoing, we conclude that there was sufficient evidence for a jury to infer a "consciousness of guilt," demonstrating knowledge of the drugs in the vehicle. Stanley, 24 F.3d at 1320-21, n.50; Leonard, 138 F.3d at 909. Therefore, the district court properly denied Frazier's motion for a judgment of acquittal.

### III. Jury Instruction

Finally, Frazier argues that the district court erred by refusing to give his requested jury instruction, which would have stated that "the defendant's mere presence in the area of the thing alleged or aware[ness] of its location is not enough to establish actual or constructive possession." He argues, as he did in issue 2, supra, that the absence of any direct evidence linking him to the cocaine in the car required the jury to infer his knowledge and dominion over the drugs, and,

20

therefore, the jury should have been instructed that his mere presence was an insufficient basis for finding guilt.

"The district court's refusal to give a defendant's requested jury instruction is reviewed for an abuse of discretion." United States v. Arias-Izquierdo, 449 F.3d 1168, 1185 (11th Cir. 2006). "To prove reversible error, a defendant must show that the instruction: (1) was a correct statement of the law; (2) was not adequately covered in the instructions given to the jury; (3) concerned an issue so substantive that its omission impaired the accused's ability to present a defense; and (4) dealt with an issue properly before the jury." Id. (quotation and citation omitted).

Here, the district court's instructions to the jury included an accurate statement of the law regarding actual and constructive possession. Leonard, 138 F.3d at 908, supra. It further instructed the jury that the defendant could not knowingly have possessed the cocaine unless he possessed it voluntarily and intentionally. Thus, the jury could not have attributed possession to Frazier through his mere presence alone, as mere presence would not establish either voluntary or intentional possession. Therefore, we conclude that Frazier's requested instruction was adequately covered by the instructions given to the jury. See also United States v. Rojas, 537 F.2d 216, 219-20 (5th Cir. 1976) (holding that the district court's charge that, "in order to find possession, the jury must find that

21

the defendant had either direct physical control or the power and intention to exercise dominion or control over the cocaine," was sufficient to preclude a conviction for mere proximity or presence to cocaine).

In light of the foregoing, we conclude that the district court did not err by denying Frazier's motion to suppress or his motion for a judgment of acquittal, nor did it err by rejecting his proposed jury instruction. We, therefore, affirm.

**AFFIRMED.**