[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 10-14245
Non-Argument Calendar

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 15, 2011
JOHN LEY
CLERK

D.C. Docket No. 0:09-cr-60229-JIC-2

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

HENRY WAINWRIGHT,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(August 15, 2011)

Before HULL, MARTIN and ANDERSON, Circuit Judges.

PER CURIAM:

Defendant-appellant Henry Wainwright ("Wainwright") appeals his

convictions for (1) conspiracy to commit Hobbs Act robbery; (2) attempt to

commit Hobbs Act robbery; (3) conspiracy to use and possess a firearm in relation to the robbery; (4) carrying and possessing a firearm in relation to a crime of violence; and (5) being a felon in possession of a firearm. On appeal, Wainwright contends that the district court erred in: (1) not granting his motions for a mistrial based on the prosecutor's comments; and (2) not granting his motion for acquittal based on sufficiency of the evidence. After review of the briefs and the record, we affirm all of Wainwright's convictions.

## I. BACKGROUND AND PROCEDURAL HISTORY

### A.    Indictment

On November 17, 2009, the grand jury returned a Superseding Indictment charging Wainwright (and his co-conspirators Jay Richitelli ("Richitelli") and Niegel Smith ("Smith")) with (1) conspiracy to commit Hobbs Act robbery, in violation of 18 U.S.C. § 1951(a) (Count 1); (2) attempt to commit Hobbs Act robbery, in violation of 18 U.S.C. § 1951(a) (Count 2); (3) conspiracy to carry and possess a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A), (o) (Count 3); and (4) carrying and possessing a firearm during a crime of violence, in violation of 18 U.S.C. §§ 2, 924(c)(1)(A) (Count 4). The Superseding Indictment further charged  Richitelli and Wainwright individually with being felons in possession of a firearm, in violation of 18 U.S.C.

2

§§ 2, 922(g)(1), 924(e) (Count 6).[1]  Wainwright pled not guilty and proceeded to a jury trial.

## B.    Trial Evidence

Because Wainwright challenges the sufficiency of the evidence, we review the trial record in great detail.  In its case in chief, the government's witnesses were (1) John Cherico ("Cherico"), a courier for Twin Oil Company ("Twin Oil"); (2) Michael Goldberg, a vice president at Twin Oil; (3) Detective Dean Soubasis ("Soubasis") of the Pembroke Pines Police Department; (4) Niegel Smith ("Smith"), Wainwright's co-conspirator; and (5) Gerard Starkey ("Starkey"), an FBI officer on the violent crime task force.  Wainwright testified in his own defense.  In rebuttal, the government called Shannon Jayroe ("Jayroe"), a United States Secret Service agent.

### 1. Courier Cherico's Testimony

John Cherico worked as a courier for Twin Oil.  Cherico's courier duties involved going to various gas stations to determine how much gas was sold and collecting the money each lessee owed Twin Oil.  He did not wear a uniform, but

---

[1]The Superseding Indictment in Count 5 charged Smith individually with being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 2, 922(g)(1).  Because Wainwright was not charged in that count, we do not discuss it further.

usually wore beige pants and a polo shirt. He drove a silver Dodge Durango owned by Twin Oil, which lacked any company markings.

In visiting gas stations, Cherico followed the same route, beginning at 10290 West Commercial Boulevard and ending at 7520 Pembroke Road. His second-to-last stop was at 1700 North University Drive, where he collected the money for two locations operated by the same owner. Cherico traveled this collection route on Tuesdays and Fridays. Cherico secured the gas station money in a safe chained to the bottom of his car's passenger seat.

On August 25, 2009, Cherico began his collections around 6:00 a.m. He spent twenty to twenty-five minutes at each stop. He was at the gas station at Taft and University (the "University station" or next-to-last station) at 8:57 a.m., as evidenced by his gas receipt. He would have arrived at his last gas station at 7520 Pembroke Road (the "Pembroke station" or last pick-up station) at approximately 9:20 a.m. Cherico did not know Wainwright or the co-defendants.

### 2. Detective Soubasis's Testimony

Detective Dean Soubasis testified that he had worked at the Pembroke Pines Police Department for eighteen years, thirteen as a detective. At approximately 9:14 a.m. on August 25, 2009, Detective Soubasis was patrolling a residential area between Pembroke Road and Pines Boulevard in Broward County "because of a

4

rash of residential and car burglaries . . . in that specific area." He was in an unmarked patrol car.

Detective Soubasis saw a Volkswagen parked suspiciously on a sidewalk near a corner residence. Looking into the car, Soubasis noticed that the passenger was wearing black clothing from the chest up and was putting on black gloves. Soubasis checked the car's license plate, "TAZRULE," to determine whether the car's occupants lived in the area or if they might be planning to burglarize an area residence. Soubasis became more suspicious because he did not see any cars in the corner residence's driveway, but he did see one in the carport. As Soubasis passed the Volkswagen and started to make a U-turn, the Volkswagen pulled out of its parked spot and drove southwest on 71st Avenue. Soubasis stopped the Volkswagen for illegally parking on the sidewalk. Soubasis also wanted to investigate why the passenger in the car was putting on black gloves and the possibility that the car's occupants were "loitering and prowling in the area."

As Detective Soubasis began to follow the Volkswagen to pull it over, he observed the Volkswagen turn right from 71st Avenue onto Pembroke Road without stopping at the stop sign posted at the corner. Soubasis later testified that there were seven-tenths of a mile between the house on 71st Avenue and the traffic stop location, one-half of one mile between the house and the Pembroke Road

Sunoco (the final pick-up station), and two-tenths of a mile between the Pembroke Road Sunoco and the traffic stop location. Soubasis stopped the Volkswagen at 9:16 a.m.

Soubasis exited his car and asked both occupants of the Volkswagen to put their hands up. Initially, both occupants complied, but as Soubasis approached the back of the Volkswagen, the passenger put his hands down and leaned forward. Soubasis yelled twice for the passenger to put his hands back up; the passenger complied. Soubasis testified that Wainwright was the driver of the Volkswagen and made a courtroom identification of him; Smith was the passenger.

Detective Soubasis smelled marijuana from within the car. He noticed that passenger Smith had taken his gloves off and was shaking uncontrollably and sweating. Soubasis asked for Wainwright's driver's license, registration, and proof of insurance, but Wainwright had only his driver's license and explained that the car belonged to his roommate. When Soubasis asked Smith and Wainwright what they were doing, Wainwright answered that they were on the way to meet their boss at a Sunoco gas station and that their boss had a paint job for them. Soubasis then advised Wainwright of his Miranda rights because Soubasis intended to ask Wainwright about (1) Wainwright's presence "in an area where they had 39 to 42 burglaries in a very short period of time"; (2) why Smith

6

had taken his gloves off; and (3) the smell of marijuana in the car. Wainwright agreed to waive his <u>Miranda</u> rights and make a statement.

In response to Soubasis's questioning, Wainwright stated that he did not have any drugs or weapons on his person and that Soubasis "could go ahead and check him." Soubasis then searched Wainwright, finding about one and one-half grams of marijuana and a package of rolling papers—Wainwright said that he forgot he had the marijuana.

When questioned about why he and Smith had been on 71st Avenue (which is near Pembroke) that morning, Wainwright "gave two inconsistent stories." The first story was that Wainwright and Smith were going to meet Wainwright's boss at a Sunoco gas station, where Wainwright's boss would give them a paint job. Detective Soubasis testified that Wainwright was wearing shorts and a t-shirt, and Soubasis did not see any paint supplies or equipment inside the Volkswagen at any time. Wainwright could not tell Soubasis where this paint job was to occur and did not tell Soubasis that the job was to take place in the Hollybrook Retirement Community. Wainwright did not give Soubasis the name or telephone number of his boss when asked to do so, nor did he give Soubasis the address of the gas station where he was to meet his boss. Soubasis gave contradictory testimony as to whether Wainwright identified Richitelli as his boss.

The second reason Wainwright gave for being on 71st Avenue that morning was that Smith had an ex-girlfriend in the area from whom Smith needed to retrieve belongings. When Smith and Wainwright got to her home, they noticed her car was still in the driveway. They parked and waited for her to leave so Smith could go inside and get his property. Upon further questioning, Wainwright could not describe this house, could not provide directions to the house, and could not describe the ex-girlfriend's car. Detective Soubasis later found a gun in Wainwright's car, which Wainwright said must belong to Smith. Soubasis placed Wainwright under arrest for loitering and prowling, possession of marijuana, and possession of drug paraphernalia. Soubasis issued a citation to Wainwright for being illegally parked on the sidewalk and for running the stop sign.

Upon going to the passenger-side door of the Volkswagen, Detective Soubasis saw Smith's black gloves between the passenger seat and the car door. Soubasis removed Smith from the car. Smith was dressed in all-black clothing. Soubasis advised Smith of his Miranda rights, and Smith agreed to make a statement.

Smith initially told Detective Soubasis that he and Wainwright were on 71st Avenue because they were on their way to a paint job. Soubasis's suspicions were raised because both Wainwright and Smith told him they were going to a paint job,

8

but neither was wearing appropriate clothing, nor did they have any painting supplies in their car.

Smith then changed his story. Smith said that he and Wainwright were in the area to rob a drug dealer of $20,000, using the gun Smith had under his passenger seat.[2] Smith agreed to show some of the arresting officers the location of this drug dealer's home. As soon as the officers took Smith away from the traffic stop location, Smith asked them to stop so he could tell them the truth about the robbery he and Wainwright planned to commit against a money courier. Smith did not initially tell the officers about this plan because he did not want Wainwright to know he had revealed their plans.

Smith then directed the detectives to the Sunoco gas station at 7520 Pembroke Road (the last pick-up station), telling them that this was the gas station where he and Wainwright planned to rob the money courier. Smith told the detectives that he had stayed at [co-Defendant] Richitelli's house in Hallandale the night before. On the morning of August 25, "Smith waited for Wainwright to come and pick him up at Richitelli's house." According to Detective Soubasis, Smith told the officers that he and Wainwright were going to wait for a call from

_____

[2]Smith never told Soubasis that he and Wainwright were in the neighborhood to retrieve Smith's possessions from his ex-girlfriend's home.

Richitelli advising them when the courier made the second-to-last stop on the courier's route. Once Smith and Wainwright received this phone call, they planned to proceed to the final gas station on the courier's route (the Pembroke station), where they would wait for the courier to arrive and commit the robbery.

Smith told Detective Soubasis that he and his co-conspirators had performed surveillance while planning the robbery to make sure that the courier's route was consistent from day-to-day. Smith was able to give a physical description of the courier, including the courier's clothing. He told Soubasis that the courier carried a gun in his car's glove compartment and what kind of car the courier would be driving. Smith said that he, Wainwright, Richitelli, and an individual at the Sunoco station were involved in the robbery.[3]

Smith and Wainwright's plan was to wait (beside the house on 71st Avenue) for Richitelli's call. Upon receiving the call, they would proceed to the immediate area of the gas station. Then, "once the money courier pulled into the gas station, they were going to make their approach and park beside the money courier's car." Once the courier came out of the gas station with the money, Smith planned to

_____

[3]It is unclear from the record whether this individual worked at the Sunoco station where the co-conspirators planned to rob courier Cherico or was an employee of Twin Oil. Depending on who was testifying, this person will be described either as "the Sunoco employee" or "the Twin Oil employee."

10

confront the courier with a gun, take the bag of money and the courier's car keys, and drive away in the courier's car. Then, Smith and Wainwright would meet at a predetermined location where they would take all of the money from the courier's car, leave the courier's car, and flee to Richitelli's house in Hallandale, where they would divide the money.

At the time of his arrest, Smith was wearing two sets of clothing, planning to throw one away after the robbery to avoid identification. Smith was putting on the black gloves because he and Wainwright had received the call from Richitelli telling them that the courier was on his way to the final stop on his route. Smith expected that the robbery would net the trio roughly $80,000, and that, as the gunman, he would receive half of the proceeds.

Detective Soubasis found a .40 caliber Beretta gun (which had one bullet in its chamber and ten in its clip) wrapped in a white towel under the passenger seat in the Volkswagen. Smith told Soubasis that the gun came from Richitelli. The gun was not traced to any of the defendants, and the police lab found no fingerprints on the gun. Soubasis also found Smith's black gloves in the car.

On cross-examination, Detective Soubasis confirmed that the Volkswagen was registered to Wainwright's home address. Soubasis clarified that Smith told the arresting officers that Richitelli and the Sunoco insider had begun planning the

11

robbery in November 2008, and that Smith and Wainwright were only brought into the plan later.

### 3. Co-Conspirator Niegel Smith's Testimony

The government next called Niegel Smith to testify. Smith admitted that he was convicted of several crimes arising from this August 25, 2009 incident. Smith described the roles of each co-conspirator. The Twin Oil employee would give information on what the courier looked like, the courier's routes, and how much money the courier would be carrying. Richitelli would perform surveillance. Wainwright would drive. Smith would take the courier's money and vehicle. Smith had information about the courier from both his own observations and from Richitelli.

The co-conspirators expected to steal anywhere between $40,000 and $80,000. They expected the robbery take to be larger because school was in session. Richitelli provided Smith with a piece of paper from Twin Oil listing all of the courier's stops. The Pembroke station was the final stop on the courier's route (the University station was the second-to-last stop). Smith testified that a Twin Oil employee—a dispatcher—helped plan the robbery because the employee was indebted to Richitelli and his brother "for money and other things."

Richitelli, who conducted surveillance, was to call Smith and Wainwright on their cell phones when the courier departed his second-to-last stop (the University station). On August 25, 2009, Richitelli watched the second-to-last Sunoco station from the Chevron station diagonally across the intersection of Taft Street and University Drive. Smith knew this because he and Wainwright drove past Richitelli that morning. When they drove past Richitelli, Smith saw the courier pumping gas at the second-to-last station.

As Smith and Wainwright headed from the second-to-last station (the University station) back to the vicinity of the final station (the Pembroke station), Wainwright received a call from Richitelli to let him know the courier had arrived at the second-to-last station. Smith and Wainwright then proceeded to a neighborhood in the general vicinity of the Pembroke station to await a phone call from Richitelli telling them that the courier was en route. Smith believed the neighborhood they stopped in was in the vicinity of 72nd Avenue. While Wainwright and Smith awaited the call from Richitelli, they parked illegally on the sidewalk and rolled a marijuana cigarette, but were never able to smoke it. They were roughly a five-minute drive from the Pembroke station, which they could not see from where they parked.

13

Smith, Wainwright, and Richitelli had formed three different plans for the robbery. After describing the three plans, Smith stated that he and his co-conspirators decided to choose their plan based on developments the day of the robbery. The robbery was not necessarily going to take place on August 25, 2009, and could have been aborted depending on what was happening around the last gas station (the Pembroke station) that morning. Because of information provided by Richitelli, Smith knew that the courier drove his route every Tuesday and Friday. Smith showed the court where he and his co-conspirators planned to take the courier's car to empty it of the stolen money.

Smith described the surveillance he and his co-conspirators performed on August 21, 2009. That morning, Wainwright and Smith scouted the area around the last gas station on Cherico's route (the Pembroke station), while Richitelli watched the second-to-last gas station (the University station). The trio communicated via cell phone. Smith believed Richitelli had planned the robbery since November 2008, but he was not brought in to participate until mid-August 2009.

Smith did not wear the gloves Detective Soubasis saw for a paint job. He wore two sets of clothing to the robbery so that he could discard one and "change [his] description."

14

Smith obtained "through Jay Richitelli" the .40 caliber Beretta pistol he planned to use during the robbery. Wainwright put the gun into the Volkswagen the morning of the robbery. Smith admitted, however, that when he was arrested, he told the officers Richitelli put the gun in the car. The morning of August 25, Wainwright told Smith the gun was in the car.

Between 7:00 and 7:15 a.m., Smith and Wainwright left Richitelli's house and were behind schedule due to Wainwright's tardiness. Smith and Richitelli each called Wainwright's phone between 6:00 and 6:30 a.m. to make sure he was awake. Smith and Wainwright had planned to use a different car that morning, but abandoned that plan because the other car was not in running order.

While Smith and Wainwright were parked illegally in the area where Detective Soubasis observed them, they received a phone call from Richitelli alerting them that the courier was on his way to the Pembroke station (the last pick-up station). At that time, Smith put the gloves on his hands to prepare for the robbery. Smith put his hands down twice after Soubasis directed him to keep them in the air, once to take off and hide his gloves, and once to answer a phone call from Richitelli. When Soubasis questioned him, Smith initially stated that he and Wainwright were in the area to perform a paint job. Smith lied so that he would not contradict Wainwright's story.

15

After Detective Soubasis questioned Wainwright, Soubasis told Smith that Wainwright said he and Smith were in the area to rob a drug dealer, a story Smith then adopted as his own. Smith told the arresting officers that he could take them to the drug dealer's house, but then told them the truth about the planned Sunoco robbery. Smith told the truth because, despite his desire not to contradict Wainwright, he did not want to waste the officers' time by having them look for a drug dealer's house that did not exist. Smith described his and his co-conspirators' plan to "rob [the courier] of his money and take his car and leave the area."

After Smith was arrested and taken to the Pembroke Pines police station, he agreed to aid the investigation by placing a recorded call to Richitelli. Richitelli was arrested based on this call. Smith confirmed that both Wainwright and Richitelli were aware of, and involved in, the attempted armed robbery of the courier on August 25, 2009. Smith admitted that he was convicted of numerous prior felonies. Smith was testifying in hopes of helping himself and getting a sentence reduction, but was not promised a particular sentence in exchange for his testimony.

On cross-examination, Smith testified that (1) Richitelli, not Wainwright, had been planning the robbery since November 2008, and (2) Richitelli had the

16

Twin Oil contact and provided the courier's route information. In his post-arrest statement, Smith indicated that (1) Richitelli put the gun in the car the morning of the robbery and (2) Smith was there to "case" the robbery, but that he would do the robbery that day if conditions permitted. On redirect examination, Smith reconfirmed that he had planned to commit the robbery on August 25, 2009 if conditions permitted.

### 4. Detective Starkey's Testimony

The government next called Gerard Starkey, who worked as a detective for the City of Doral Police Department and as an FBI Task Force officer on the violent crime task force. After Wainwright waived his <u>Miranda</u> rights, Wainwright told Detective Starkey that he and Smith were going to a paint job in the Hollybrook area of Pembroke Pines. Wainwright and Smith met that morning at Richitelli's house, initially planning to get clothes from Smith's ex-girlfriend's house. While they were on their way to Smith's ex-girlfriend's, they received a phone call about a paint job in the Hollybrook area.

Wainwright told Detective Starkey that "they were going to meet at a gas station prior to going to Hollybrook." Wainwright expressed surprise at the presence of the gun in the vehicle he was driving, and stated that it must belong to Richitelli or Richitelli's girlfriend. Wainwright expressed "disbelief" when

Starkey told him that Smith had confessed that Smith, Wainwright, and Richitelli planned to commit armed robbery of the money courier. Denying involvement, Wainwright indicated that Smith and Richitelli might have been planning the robbery themselves.

During his interviews of the suspects, Detective Starkey obtained their cell phone numbers so that he could obtain their call records. The government introduced Richitelli and Wainwright's cell phone records for the relevant time period. Starkey testified that Richitelli called Wainwright twelve times, and Smith once, between 8:57 and 9:35 a.m. on August 25, 2009.

The government also introduced downloaded information from Richitelli and Wainwright's cell phones, which revealed twenty-six actual and attempted contacts between the two, as well as with Smith, from 6:14 to 9:29 a.m. on August 25, 2009. There were nineteen actual and attempted calls between Wainwright, Smith, and Richitelli from 5:31 to 10:36 a.m. on August 21, 2009 (the day Smith testified the trio conducted surveillance on the courier).[4]

**5. Wainwright's Testimony**

---

[4]After the government rested its case, Wainwright made a Rule 29 motion for acquittal on the basis of insufficiency of the evidence. The district court denied his motion.

Next, Wainwright testified in his own defense. Wainwright was friends with both Smith and Richitelli. Wainwright talked to Smith for twenty-one minutes on August 12, 2009 about Smith's desire to "come down" to purchase marijuana and other drugs. On August 18, 2009, Smith and Wainwright met at Richitelli's thrift store so Smith could obtain growing lights from Wainwright. Prior to that day, none of Smith and Wainwright's phone conversations involved committing a robbery. While at Richitelli's store, Smith found out that he could obtain marijuana through Richitelli. Smith and Wainwright did not discuss any robbery at Richitelli's store.

Wainwright was not involved in any surveillance activities on August 21, 2009. Instead, on the 20th, Richitelli called and asked Wainwright to come to his thrift shop to speak with Richitelli's brother Scott about a paint job. On August 21, 2009, Richitelli asked Wainwright to give Smith a ride to a woman's house on Pembroke Road. Wainwright picked Smith up from Richitelli's house around 7:00 a.m. and took him to a residential area near the Pembroke station (the last pick-up station). Wainwright drove Smith to the woman's house in a Volkswagen Passat registered to Wainwright's cousin Phil Hunt.

When Smith and Wainwright arrived, however, Smith told Wainwright that they needed to wait because the woman's significant other was still at home.

19

Wainwright anticipated that they would wait only a few minutes, but the wait lasted two hours. During the wait, Wainwright spoke to Richitelli several times via cell phone. Wainwright eventually dropped Smith off and left to meet Richitelli at the Sunoco (the University station) so that they could go together to the potential paint job. Richitelli eventually cancelled the meeting altogether and told Wainwright that the meeting would take place early the next week. The next Monday, August 24, 2009, Richitelli repeatedly called Wainwright to schedule the meeting for Tuesday, August 25, 2009. Up through the evening of August 24, 2009, Wainwright had no discussions about any robbery with either Richitelli or Smith.

The morning of August 25, 2009, Richitelli and Smith called Wainwright repeatedly. Wainwright's plan that morning was to pick Smith up at Richitelli's house, drop Smith off at Smith's girlfriend's house, and go to meet Richitelli about the prospective paint job. When he took Smith to the woman's apartment, Smith told him to keep going, as the woman's significant other was once again there. Smith was wearing all black that morning, but Wainwright did not ask him why. They left the area of the woman's apartment and went to the DMV, but returned when Richitelli called about the paint job. Smith again refused to leave

the car, so Wainwright went to a bakery to get some coffee and then to a Valero gas station.

Richitelli called and instructed Wainwright to drop Smith off and to come meet Richitelli to do the paint job. After Wainwright drove around the block, Smith got out his gloves and began to put them on. When Smith refused to answer Wainwright's questions about the gloves, Wainwright pulled to the side of the road. Richitelli called and told Wainwright not to worry about Smith's gloves, and to come meet Richitelli about the paint job. Smith, however, refused to get out of Wainwright's car. Wainwright then proceeded toward the Sunoco at Taft and University, beginning the sequence of events that led to Detective Soubasis pulling him over.

After Detective Soubasis instructed them to keep their hands up and Smith failed to comply, Wainwright asked Smith what he was doing. Smith replied that he was hiding the gloves. Wainwright had seen the firearm found in the car before, at Richitelli's house, but he had not previously seen the white towel. Wainwright did not put the firearm in the towel under the front seat. Wainwright told the arresting officer that he was going to a paint job. Wainwright also told Soubasis he was giving Smith a ride to Smith's girlfriend's house so that Smith could spend time with her and collect some belongings. At the end of his direct

21

examination, Wainwright reiterated that he was not involved in the planning of the robbery, and that he did not plan to participate in the robbery.

## 6. Government's Rebuttal Witness

On rebuttal, the government called United States Secret Service agent Shannon Jayroe to testify as an expert in cellular telephones, cell towers, and sectors. Wainwright's cell phone records indicated that: (1) on August 21, 2009, his phone was in the cell sector encompassing the Sunoco gas station at 7520 Pembroke Road (the last pick-up station) between 8:39 and 8:59 a.m., and (2) that on August 25, 2009, his phone was in the cell sector encompassing the Sunoco station at Taft Street and University Drive (the University station) at 8:57 a.m.[5]

## 7. Prosecutor's Closing Arguments

Trial testimony established that Richitelli made several telephone calls to Wainwright while Detective Soubasis was interrogating Wainwright at the traffic stop. During closing argument, the prosecutor argued about what Wainwright could have done during Soubasis's interrogation to confirm his paint job story. The prosecutor suggested that, if Wainwright was innocent, he could have

---

[5]At the close of the evidence, Wainwright renewed his Rule 29 motion for acquittal, which the district court denied.

22

answered one of Richitelli's calls to Wainwright and then handed the phone to Soubasis to confirm the story. The prosecutor's comments were:

> If Wainwright was innocent, reach out and touch somebody. Detective Soubasis, can I touch my phone? I'm trying to get to a paint job right now. I'm being called about it. I would love to have you talk to my boss. He's calling me right now. Here's the phone, talk to him. The phone isn't ringing. Where are you going, what are you doing [sic] says Detective Soubasis to the defendant Henry Wainwright. What were you doing in that neighborhood? I'm going to paint. I'm going to do a paint estimate. I'm going to move Smith's possessions out of exgirlfriend [sic]. Whatever reason he gave. Let's just focus on the paint job and paint estimate. If the phone is not ringing, get in the phone, pull up the number. Dial the phone. Give it to Soubasis. <u>Prove you are innocent</u>. You are a four-time convicted felon. You got kung fud [sic] Panda- -

(emphasis added). Wainwright's counsel immediately objected and reserved his motion about the statement.

At the end of closing argument, the prosecutor pointed out to the jury that "there's one exhibit that you are not going to have with you back in the jury room and that's John Cherico." After pointing out how close Cherico came to being robbed, the government told the jury to "[r]emember [Cherico] when you are doing your deliberations, . . . and . . . return a guilty verdict so [Cherico] can have peace of mind." Wainwright objected to this comment about Cherico's peace of mind. The district court sustained the objection and immediately instructed the jury to disregard that statement by the prosecutor.

23

## 8. Motions for Mistrial

Outside of the jury's presence, Wainwright moved for a mistrial based on the prosecutor's comment that Wainwright could have proved his innocence by calling Richitelli on his cell phone to confirm the paint job story.[6] Wainwright subsequently moved for a mistrial based on the prosecutor's comment about Cherico's peace of mind, arguing it elicited "sympathy or any feelings towards [] Cherico [that] ha[d] nothing to do in [sic] [the jury's] deliberations."

The district court denied Wainwright's motions for mistrial and gave these curative instructions to the jury:

> There was an objection, a couple of objections made during final arguments by Mr. DeFabio [Wainwright's counsel]. One of which related to a comment made by Mr. Chase [the prosecutor] in his final argument regarding Mr. Wainwright proving his innocence. I have sustained that objection and I want to make it clear that Mr. Wainwright does not have to prove his innocence. He is presumed innocent. The burden is on the government to prove, through the production of evidence, his guilt beyond a reasonable doubt.

> And there was another comment by Mr. Chase that could be construed as attempting to engender sympathy for a witness. Sympathy for or against either party or for or against any witness is not something that you should consider in any way.

## 9. Convictions and Sentence

---

[6]Outside the jury's presence, the prosecutor admitted that his syntax was technically incorrect, stating that his intent was to point out the opportunity Wainwright had to prove his story to Soubasis.

The jury found Wainwright guilty on Counts 1-4 and 6. The district court sentenced Wainwright to life imprisonment on Counts 1 (conspiracy to commit Hobbs Act robbery) and 2 (attempt to commit Hobbs Act robbery), 240 months' imprisonment on Count 3 (conspiracy to carry and possess a firearm during and in relation to a crime of violence), and 180 months' imprisonment on Count 6 (felon in possession of a firearm), to be served concurrently. The district court sentenced Wainwright to 60 months' imprisonment on Count 4 (carrying and possessing a firearm during a crime of violence), to be served consecutively to Counts 1-3 and 6.

Wainwright appealed.

## II. DISCUSSION

### A. Prosecutor's Comments

On appeal, Wainwright argues that the district court should have granted a mistrial based on either (1) the prosecutor's statement that Wainwright should "[p]rove you are innocent;" or (2) the prosecutor's appeal to the jury's passion in asking the jury to give Cherico peace of mind. Even if neither comment standing

alone merits a mistrial, Wainwright argues that, taken together, the comments constitute prosecutorial misconduct.[7]

It is well-established that the government may not suggest that a defendant must prove his innocence. United States v. Bernal-Benitez, 594 F.3d 1303, 1315 (11th Cir.), cert. denied, 130 S. Ct. 2121-23 and 131 S. Ct. 314 (2010). Likewise, it is well-established that a prosecutor may not appeal to a jury's passion or prejudice. United States v. Rodriguez, 765 F.2d 1546, 1559-60 (11th Cir. 1985).

"A mistrial should be granted if the defendant's substantial rights are prejudicially affected. This occurs when there is a reasonable probability that, but for the remarks, the outcome of the trial would have been different." United States v. Newsome, 475 F.3d 1221, 1227 (11th Cir. 2007). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." United States v. Eyster, 948 F.2d 1196, 1207 (11th Cir. 1991) (quotation marks and brackets omitted).

Based on the entire record, we cannot say the district court abused its discretion in denying Wainwright's motions for a mistrial. Here, the district court promptly issued curative instructions, telling the jurors, "Mr. Wainwright does not

---

[7]We review for abuse of discretion the district court's decision to deny a motion for mistrial. United States v. Newsome, 475 F.3d 1221, 1227 (11th Cir. 2007).

have to prove his innocence.  He is presumed innocent . . . [,]" addressing the burden-shifting problem.  Importantly too, the district court had already, early on at trial, informed the jury that the lawyers' opening and closing arguments should not be considered "as either evidence in the case . . . or as your instruction on the law."   And, at the end of the trial, the district court's final jury charges instructed that "[t]he government has the burden of proving a defendant guilty beyond a reasonable doubt."  As to Cherico, the district court immediately told the jury to disregard the prosecutor's statement and later told the jury they should not base their verdict on sympathy for or against any party or witness.

If the district court gives a curative instruction, we reverse "only if the evidence is so highly prejudicial as to be incurable by the trial court's admonition."  United States v. Delgado, 321 F.3d 1338, 1347 (11th Cir. 2003) (quotation marks omitted).  In United States v. Lopez, 590 F.3d 1238 (11th Cir. 2009), cert. denied, 131 S. Ct. 413 (2010), this Court found no reversible error where the district court "took adequate curative measures," striking from the record the prosecutor's arguably impermissible statements during closing argument and issuing curative instructions.  Id. at 1257.  Given all of the curative action taken by the district court, we cannot say it abused its discretion in denying Wainwright's motions for a mistrial.

In addition, Wainwright also has not shown a reasonable probability that the outcome of his trial would have been different absent the prosecutor's remarks. See Newsome, 475 F.3d at 1227.

Wainwright further contends that, even if neither of the comments by themselves necessitated a mistrial, "taken together[,] said comments constitute prosecutorial misconduct." We disagree.[8] "To establish prosecutorial misconduct, (1) the remarks must be improper, and (2) the remarks must prejudicially affect the substantial rights of the defendant." United States v. Eckhardt, 466 F.3d 938, 947 (11th Cir. 2006) (quotation marks omitted). In determining the level of prejudice stemming from a prosecutor's comment, we examine that comment in the context of the entire trial. United States v. Hernandez, 145 F.3d 1433, 1438 (11th Cir. 1998). Given the district court's curative instructions, and placing the comments in the context of the entire record and evidence against Wainwright, we conclude Wainwright has not carried his burden to show that the comments, even taken together, prejudiced Wainwright's substantial rights.

**B.      Sufficiency of the Evidence**

---

[8]This Court reviews a claim of prosecutorial misconduct de novo, as it is a mixed question of law and fact. United States v. Eckhardt, 466 F.3d 938, 947 (11th Cir. 2006).

28

On appeal, Wainwright makes sufficiency-of-the-evidence arguments only as to his convictions for conspiracy to commit Hobbs Act robbery (Count 1) and conspiracy to carry and possess a firearm during and in relation to a crime of violence (Count 3).[9]  We address each argument in turn.

**1. Hobbs Act Conspiracy**

To prove a Hobbs Act conspiracy, the government must show "that: (1) two or more persons agreed to commit a robbery encompassed within the Hobbs Act;[10] (2) the defendant knew of the conspiratorial goal; and (3) the defendant voluntarily participated in helping to accomplish the goal." United States v. To, 144 F.3d 737, 747-48 (11th Cir. 1998).  "Presence with conspirators alone, however, or close association with them, is not by itself sufficient proof of participation in a conspiracy." Id. at 748 (quotation marks omitted).  Because Wainwright's argument is focused on the government's alleged failure to prove

---

[9]While Wainwright's brief appears to assert generally that there was insufficient evidence to convict him, he has offered argument only on the conspiracy counts.  Therefore, he has abandoned argument that the evidence was insufficient to convict him on any of the other counts of the Superseding Indictment.  See United States v. Belfast, 611 F.3d 783, 821 (11th Cir. 2010), cert. denied, 131 S. Ct. 1511 (2011).

[10]"The Hobbs Act prohibits [robbery], and attempts or conspiracies to [rob], that in any way or degree obstruct, delay, or affect commerce or the movement of any article or commodity in commerce." United States v. Kaplan, 171 F.3d 1351, 1354 (11th Cir. 1999) (en banc) (quotation marks and brackets omitted).  For purposes of the Hobbs Act, robbery is defined as "the unlawful taking or obtaining of personal property from the person or in the presence of another, against his will, by means of actual or threatened force, or violence, or fear of injury, immediate or future, to his person or property . . . ."  18 U.S.C. § 1951(b)(1).

conspiracy, the question here is really whether the government showed "(1) an agreement between the defendant and one or more persons, (2) the object of which is to do either an unlawful act or a lawful act by unlawful means." United States v. Arias-Izquierdo, 449 F.3d 1168, 1182 (11th Cir. 2006). To prove a conspiracy, "[t]he government is . . . not required to demonstrate the existence of a formal agreement, but may instead demonstrate by circumstantial evidence a meeting of the minds to commit an unlawful act." Id. (quotation marks omitted). Additionally, "[p]roof that the accused committed an act which furthered the purpose of the conspiracy is an example of the type of circumstantial evidence the government may introduce to prove the existence of agreement." Id.[11]

Wainwright's cursory argument on appeal is that the evidence against him "was that he merely associated with Smith and Richitelli; that they spoke on their phones; and that he gave Smith a ride." Furthermore, "[t]here was simply

---

[11]"We review the sufficiency of the evidence de novo, viewing the evidence in the light most favorable to the verdict, and we make all inferences and credibility determinations in favor of the verdict." United States v. Chirino-Alvarez, 615 F.3d 1344, 1346 (11th Cir. 2010) (quotation marks and citation omitted). "We will uphold a district court's denial of a motion for judgment of acquittal if a reasonable trier of fact could conclude the evidence established the defendant's guilt beyond a reasonable doubt." United States v. Taylor, 480 F.3d 1025, 1026 (11th Cir. 2007); see also United States v. Merrill, 513 F.3d 1293, 1299 (11th Cir. 2008) ("[I]t is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, provided that a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt." (quotation marks omitted)). Moreover, "we assume that the jury made all credibility choices in support of the verdict." United States v. Jiminez, 564 F.3d 1280, 1285 (11th Cir. 2009).

insufficient evidence for the jury to infer knowledge and/or find participation by [Wainwright] . . . .”

Based on the evidence in the record, a reasonable jury could readily find that Wainwright conspired with Smith and Richitelli to commit Hobbs Act robbery. Smith expressly testified that Wainwright conspired with Smith and Richitelli to rob Cherico with a gun. Smith testified that Wainwright assisted with surveillance and planning the robbery, picked him up at Richitelli’s house to drive him to the Pembroke station (the last pick-up station) to commit the robbery, put the gun in the car the day of the robbery, and corresponded with Richitelli about the courier’s whereabouts. Copious amounts of corroborating testimony and evidence, including cell phone records, supported Smith’s story and contradicted Wainwright’s story. Because we assume that the jury makes credibility inferences in support of its verdict, United States v. Jiminez, 564 F.3d 1280, 1285 (11th Cir. 2009), we must assume that the jury in this case credited Smith’s testimony, not Wainwright’s. Furthermore, if the jury disbelieved Wainwright’s testimony, it was entitled to use that testimony as substantive evidence of Wainwright’s guilt. United States v. Hunt, 526 F.3d 739, 745 (11th Cir. 2008).

31

Given the record before us, there was clearly sufficient evidence for a reasonable jury to conclude that Wainwright did in fact conspire to commit Hobbs Act robbery.

### 2. Conspiracy to Carry and Possess a Firearm During and in Relation to a Crime of Violence

There is also ample evidence to support Wainwright's conviction for conspiracy to carry and possess a firearm in relation to Hobbs Act robbery. To sustain Wainwright's conviction under 18 U.S.C. § 924(c)(1)(A), (o), "the government must show that, . . . [Wainwright] used, carried, or possessed a firearm in furtherance of [a] conspiracy." United States v. Gunn, 369 F.3d 1229, 1234 (11th Cir. 2004). "To establish constructive possession, the government must show that the defendant exercised ownership, dominion, or control over the firearm or the vehicle concealing the firearm." Id. To show that the possession of the firearm was in furtherance of the crime, "[t]he government must also establish some nexus between the firearm" and the offense. Id. Finally, "under § 924(c), a defendant may be liable for a co-conspirator's possession if possession was reasonably foreseeable." Id.

No one disputes that there was a gun in the car Wainwright was driving. Smith expressly testified Wainwright put the gun in the car. Even without Smith's

testimony, there was sufficient evidence for the jury to find that Wainwright constructively possessed the gun—namely, Soubasis's testimony that he found the gun in the car Wainwright was driving. See id. at 1234 (establishing constructive possession requires government to show defendant exercised ownership, dominion or control over vehicle concealing firearm). And, as discussed above, there was sufficient evidence to show that Wainwright conspired to commit Hobbs Act robbery. There was also sufficient evidence at trial to establish that Wainwright and his co-conspirators planned to use the gun to further the Hobbs Act robbery conspiracy. They were caught with the gun a mere half-mile from the Sunoco station they intended to rob. Smith also testified that he and his co-conspirators planned for Smith to use the gun to confront Cherico and take the car and money from him. Thus, the government presented sufficient evidence for a reasonable jury to infer that the gun was in Wainwright's car in furtherance of the robbery conspiracy.

**AFFIRMED.**